Argued June 10, reversed and remanded October 19, 1921, rehearing denied April 11, costs taxed April 11, 1922.

# PHEZ COMPANY, A CORPORATION, *v.* SALEM FRUIT UNION, A CORPORATION, ET AL.

### (201 Pac. 222; 205 Pac. 970.)

**Contracts—Third Person may Sue to Enforce Contract in His Favor.**

1. Where two persons make a contract for the benefit of a third party, he may maintain a suit directly against the promisor to enforce the contract.

**Contracts—Contract Between Others Held for Plaintiff's Benefit and Enforceable by Him.**

2. Where by the terms of a contract between plaintiff and a fruit company it was bound to deliver to plaintiff berries grown by several independent growers who executed an agreement with the company binding themselves to deliver to plaintiff and not to the company all the berries grown on their respective lands for a stipulated price, the grower's contract was enforceable by plaintiff.

**Injunction—Buyer Held Entitled to Enjoin Seller from Selling to Others.**

3. Where plaintiff contracted with a fruit company for loganberries, and certain growers agreed with the company for plaintiff's benefit to deliver such berries directly to him, plaintiff, if not entitled to decree of specific performance, might be aided by injunction against sale of fruit to others.

**Equity — Jurisdiction not Lost Because Relief Asked has been Rendered Unavailable by Defendant's Acts.**

4. In a suit by a buyer to enjoin sellers from selling to others, the fact that the remedy of injunction was not applied, and that defendants by selling their product to other parties put it out of their power to comply, would not oust equity of the jurisdiction it had when the suit was instituted, but it might retain jurisdiction to award damages if deserved, especially in view of the probable necessity of an accounting.

**Abatement and Revival—Suit Held not Barred by Pending Action With Divers Parties.**

5. A suit by a purchaser of fruit against a fruit company and against various fruit-growers, who had agreed with the company to deliver fruit to plaintiff, was not barred by a suit by the company against the plaintiff, in which he had filed an answer, there being a diversity of parties.

**Sales—Burden of Proving Rescission by Agreement Held on Defendants.**

6. In action by buyer against fruit company and fruit-growers to enforce contracts whereby the company had agreed to sell fruits

and the growers by subsidiary contract with the company had agreed to deliver their fruit to the buyer, the defense that both company and growers had been released from performance by rescission by verbal agreement between the buyer and company was an affirmative defense, burden of proving which was on defendants.

#### Sales—Evidence Held Insufficient to Show Rescission by Agreement.

7.  Evidence *held* insufficient to show rescission by verbal agreement of contracts whereby a fruit company agreed to sell fruit to buyer and growers agreed with company to deliver fruit to the buyer.

#### Release—Release of Party to Contract Held not to Release Others Similarly Situated, but Under Independent Contracts.

8.  Where a fruit company agreed to sell fruit for several seasons to buyer, and several fruit-growers by independent contracts agreed with the company to deliver fruits grown by them to the buyer, a release of one of the fruit-growers from his contract by the buyer and the company did not release the other fruit-growers from their contracts.

#### Sales—Buyer on Sellers' Sale to Others Held Entitled to Difference in Price He was to Pay and That Paid by Others.

9.  Where fruit company agreed to sell fruit for several seasons to buyer, and several growers agreed with the company to deliver all their fruit to the buyer, he was entitled, on breach of the agreements by sales to others, to recover the difference between the price of berries sold to the other parties and the amount which he was to pay, though impracticability of ascertaining probable profits might preclude recovery therefor.

### ON PETITION FOR REHEARING.

#### Contracts — Agreement by Defendant With Buyer of Berries to Deliver Them to Plaintiff, to Whom Buyer had Sold Them, Enforceable by Plaintiff.

10.  Assuming that a contract may only be enforced by a third party for whose benefit it was made, where some fund or property has come into hands of the promisor, in consideration of which the promisor agrees to discharge a legal obligation owed by the promisee to a third party, where a fruit union sold berries to be grown by defendants to plaintiff, and defendants contracted with the union to deliver the berries direct to plaintiff, the rule might properly be invoked by plaintiff in support of its action against defendants.

#### Agriculture—Berry-growers Held Bound by Contract of Sale Made by Fruit Union.

11.  Where an incorporated fruit union, organized by growers of berries to facilitate the sale and delivery of their fruit products, as their agent, made a contract for the sale of their berries to plaintiff, defendants were bound thereby, though the contract was in writing, and executed in the name of the agent alone; its body clearly showing that the party executing it was acting as agent, and for whom he was acting.

Injunction—Sellers of Berries Contracting to Deliver Them to Third Party may be Enjoined by the Third Party from Selling Them Elsewhere.

12. Where a fruit union contracted to sell berries to be grown by defendants to plaintiff, and defendants contracted with the union to deliver the berries direct to plaintiff, if defendants be regarded as strangers to · the contract of sale, plaintiff is still entitled to an injunction against the sale of the berries elsewhere under the rule that a stranger, wrongfully inducing another to commit a breach of contract, or intentionally disabling him from discharging his obligations, is liable in damages, or, in a proper case, may be enjoined.

Agriculture—Fruit Union Contracting for Sale of Grower's Berries, Held to have Power, Coupled With Obligation Preventing Revocation of Agency.

13. A fruit union which, with authority from the growers of berries, contracted to sell and deliver all the berries raised by them during a number of years and subjected itself to liability for damages for failure to make such deliveries, had such a power, coupled with an obligation, as prevented a revocation of the agency.

From Marion: George G. Bingham and Percy R. Kelly, Judges.

In Banc.

This is a suit brought by the plaintiff to enforce by injunction the performance by defendant Salem Fruit Union of a contract entered into on May 24, 1917, between the Northwest Fruit Products Company, plaintiff's predecessor, and the defendant, whereby defendant agreed to sell and deliver to plaintiff's predecessor about 1,200 tons of fresh loganberries of the crops of 1917, 1918, 1919, 1920 and 1921, at the agreed price of three cents per pound for the crop season of 1917, and thereafter during the remaining years at the rate of $61.50 per ton. Said berries

---

12. On right of action for damages for inducing breach of contract, see notes in 16 L. R. A. (N. S.) 746; 28 L. R. A. (N. S.) 615, and L. R. A. 1915F, 1076.

Civil liability for interference with contract relations, see notes in 2 Ann. Cas. 241; 11 Ann. Cas. 337; Ann. Cas. 1912B, 1162; Ann. Cas. 1916E, 608.

were to consist of the entire crops of certain growers named therein and including those mentioned made defendants in this action. The contract is designated exhibit "A" to plaintiff's complaint, and its due execution is not disputed. Said exhibit is too long to be set out in this statement but such features of it as are essential are referred to in the opinion.

The complaint alleges that contemporaneously with the execution of exhibit "A" the defendant Salem Fruit Union for the protection of itself and plaintiff's predecessor entered into a written agreement with each of the defendant growers of loganberries, which contract provided that each grower should sell and deliver to the fruit union all the loganberries grown during the years above mentioned upon certain specified tracts of land, the acreage and estimated tonnage of each tract being particularly specified. Other conditions of this contract are as follows:

"3. The grower agrees that his fruit may be sold and the proceeds prorated under such pooling system as is now used or shall hereafter be adopted by the union.

"4. The grower agrees that the union shall have, and he hereby gives and grants to the union, a first lien or crop mortgage on all his crop of fruit growing or to be grown on said premises to secure the payment of any indebtedness now owing by him to the union or any indebtedness which he shall hereafter incur to said union by virtue of this contract or transactions arising thereunder. The grower hereby authorizes and instructs the union to deduct from the proceeds of the sale of his fruit any sums which he may owe the union.

"5. The union agrees to receive, store and market said grower's fruit, provided said fruit is, in the judgment of the union, of marketable standard and quality, and it is understood and agreed that the union shall not be liable for any unavoidable loss,

damage or injury, or for any unavoidable failure to secure storage or to sell said fruit.

"6. The union agrees to pay over to the grower the entire proceeds of the sale of his fruit after deducting such amounts as the grower shall then be indebted to the union; such indebtedness to include all handling and marketing charges as filed and assessed by the board of directors of the union, which charges shall be sufficient to pay the general operating expenses; such indebtedness shall also include all the accounts for supplies purchased, for stock subscribed or money advanced.

"7. The grower hereby appoints the union his exclusive agent and hereby gives said union an exclusive right to sell said fruit.

"8. Whereas the union must provide for the payment of certain overhead expenses and fixed charges and must expend such sums as are necessary to keep in touch with crop and market conditions and must provide warehouse and storage facilities in proportion to the tonnage contracted; and whereas such expenses should be prorated over all of the fruit contracted to be sold, the grower, therefore agrees that in the event he withholds his fruit or any part thereof in contravention of this agreement, he will pay to the union for each package of fruit so withheld as liquidated damages for such violation of his contract, the sum of ten cents (10c) for each box of apples or pears, ten cents (10c) for each crate of berries or cherries; five cents (5c) for each crate or box of prunes or peaches, and for other varieties of fruit an amount in such proportion to above charge made for apples as the average market price of apples during the season in which the violation occurred.

"9. The grower agrees that in the event suit or action is brought to recover for supplies furnished, services rendered or expenses incurred or to enforce any of the provisions of this contract, to pay such attorneys' fees in such suit or action as the court shall adjudge reasonable.

"10. It is mutually understood and agreed that this contract shall remain in effect for a period of time

from date until March 1st, 19——, and every year thereafter continually until canceled by one of the parties hereto, providing that it shall only be canceled on the first day of March of any year after said period by the party so canceling giving notice in writing to the other party thereto during the twenty days prior to said March first, that he desires to cancel his contract; provided, however, that neither party shall cancel this contract until that party shall have fully paid any indebtedness due by it or him to the other party, including all stock subscriptions due or to come due or notes given for the same.''

It further appears that about January, 1918, the defendant union secured from a large majority of the growers a contract materially modifying the contract as it appears in exhibit ''B'' above set out. The form of such modification is set forth as exhibit ''C'' to the complaint and is as follows:

''This agreement made this —— day of ——, 19——, by and between Salem Fruit Union, a corporation, hereunder referred to as the union, and —— of the County of ——, State of Oregon, hereinafter referred to as the grower,

''Witnesseth, that for and in consideration of the covenants and agreements herein contained, the said grower does hereby constitute and appoint the said union, as his sole and lawful agent, to enter into contract for him, and on his behalf, and in his name, for the sale of all the loganberries to be grown upon his premises, for the years 1918 to 1921 inclusive, which crop of berries shall be delivered to said union to be sold by it, with other growers entering into similar contracts with such union, which shall constitute a pool, and shall be designated as the '1917 Five Year Loganberry Pool,' which said pool shall be sold in its entirety by said union to the Northwest Fruit Products Company, at three and one-half cents ($3\frac{1}{2}$ cents) per pound net to said grower, and the grower, as part of said pool, hereby gives the said union full power of attorney to make said sale.

"That the yard herein mentioned consists of approximately —— acres and is located near —— Marion County, Oregon, and the crop of the year 19— is estimated at —— tons.

"That said berries, in the judgment of the union, shall be marketable and of standard quality, to be delivered by the grower to the Northwest Fruit Products Company or its assigns at their factory or subject to their order, in accordance with terms and conditions of said authorized contract. Grower agrees to care for and harvest the crop in a husbandlike manner.

"In case said Northwest Fruit Products Company shall fail by reason of act of God or public enemy or other unavoidable occurrences, to perform its part of such agreement, or any part thereof, entered into with said union as the agent of the grower, the said grower agrees that his said fruit may be handled in said pool with the fruit of other growers making contracts similar to this, for any year or years or portions of a year that the Northwest Fruit Products Company shall be so prevented from fulfilling its part of the agreement, in which event, said union shall market said fruit as a continuation of the said Five Year Loganberry Pool of 1917, to the best advantage of the grower as the judgment of the board of directors of said union may dictate. The said grower shall receive his *pro rata* of the net returns for the sale of said pool after deducting for the services in the handling and marketing of such fruit, the charges and assessments that may be made by the board of directors of said union, which may be deducted from the amount of the money received from the sale of said fruit before paying the same to the grower.

"The grower agrees that in the event of suit or action brought to recover for supplies furnished, services rendered or expenses incurred or to enforce any of the provisions of this contract, to pay such attorneys' fees in such suit or action as the court shall adjudge reasonable.

"It is understood that the conditions herein contained shall run with the land on which said berries are to be raised, and shall bind the parties herein, their heirs, administrators and assigns and shall continue to be in full force and effect during the crop years of 1918, 1919, 1920 and 1921. It being understood that upon the execution of this contract, the former contract heretofore entered into on the —— day of ——, 19—, between the undersigned grower and said union, shall become null and void and of no effect, except that the pool created by such agreement shall be continued by this agreement. This agreement is binding upon the successors and assigns of each party hereto.

"In witness whereof, the said parties have hereunto set their hands this —— day of ——, 19—.

> "SALEM FRUIT UNION,
> "By ———————————
> "——————————————,
>                    "Grower."

The complaint alleges that plaintiff and its predecessor in interest have been at all times since the date of the contract, exhibit "A," engaged in the business of buying and selling loganberries at Salem, Oregon, and in manufacturing loganberries into certain products now known as "Phez," "Loganberry Juice," "Loju," and "Phez Jellies and Jams," and by the expenditure of large sums of money in advertising and in securing the service of salesmen and solicitors, have built up a trade demand for said products which will require the use of all the berries contracted for by plaintiff with individual growers and all fruit contracted for by plaintiff with defendant pursuant to exhibit "A." It is further alleged that plaintiff has contracted for and has expended in advertising said products for the year 1919 sums of money particularly set forth and aggregating more than $200,000, whereby it has created a nation-wide

demand for its said products, and that for the purpose of caring for such demand it has greatly increased the capacity of its plant at a cost of more than $50,000 and has now on hand for the purpose of marketing the said 1,200 tons of berries the necessary bottles, caps, labels, cartons, etc., which have been manufactured and prepared for that purpose and will be of no value for any other purpose. The plaintiff states that the loganberry is of recent origin and not extensively grown in any section of the United States or of the world save the Willamette Valley, and that the acreage thereof is limited, so that the plaintiff, if it cannot secure the berries contracted for with the defendant, cannot supply the demand for its products or fill its contracts, will lose the benefit of its advertising and of its expenditures for increased working forces and enlarged capacity of its plant and machinery, will lose its prestige with the wholesale trade and will be irreparably damaged in a sum which it is impossible to compute and for which the Salem Fruit Union will be unable to compensate the plaintiff in damages. The complaint alleges in effect that such damages will not aggregate less than $375,000 and that the whole assets of the Salem Fruit Union do not exceed the sum of $50,000 and would be wholly insufficient to compensate plaintiff in damages in an action at law.

The concluding allegation of the complaint is as follows:

"That under and by virtue of the terms and conditions of the contract and agreement between the Salem Fruit Union, defendant herein, and the Northwest Fruit Products Company, predecessor in interest of the plaintiff herein, the said Fruit Union was obliged to deliver to said Northwest Fruit Products Company and to plaintiff as its successor, all of

the loganberries grown during the season of 1918 by the several members of the so-called 1917 pool, the names of said members being attached as a schedule to plaintiff's exhibit 'A.' That as a means of assuring and protecting itself in the fulfillment of the terms and conditions of said contract, the Salem Fruit Union entered into certain written contracts and agreements with the said several growers whose names are attached to exhibit 'A' for the growing and producing of loganberries for the seasons of 1917, 1918 and other years, which said contracts and agreements were in full force and effect during the berry season of 1918, a copy of the form of said contracts used by said fruit union in contracting with its said growers being hereto attached, and for identification marked exhibits 'B' and 'C'; that said contracts designated as exhibits 'B' and 'C' were made by said fruit union with each of the individual defendants herein for the benefit of plaintiff, and under the terms thereof the said Salem Fruit Union was legally entitled and bound to enforce delivery from said growers, and was legally entitled to collect damages from such of its said growers as failed to deliver berries in accordance with their several contracts with said fruit union for the difference between the contract price and the market value of five cents per pound; that there is an unsettled balance due from plaintiff to defendant on account of the berries delivered by defendant Salem Fruit Union to plaintiff, during the year 1918 under the contract herein mentioned, and that plaintiff has a good and valid counterclaim as against a portion or all of said balance due for the purchase of berries, on account of damages accruing to plaintiff by virtue of the non-delivery to plaintiff of all the berries grown by the several growers whose names are designated in said schedule attached to exhibit 'A,' for the difference between the contract price and the market value of said loganberries which at date of delivery was five cents per pound. That plaintiff has no knowledge or information as to the number of pounds of berries so

produced by said growers and not delivered to plaintiff in accordance with the terms of said agreement, and that the knowledge and information regarding such facts lies solely with the defendant Salem Fruit Union and the several other defendants herein named. That in order to ascertain the extent of said counterclaims, and in order rightfully to adjust the balance due to the defendant for berries delivered during the season of 1918, it is necessary that an accounting be had between plaintiff and defendant as to the number of pounds of berries produced during the season of 1918 by the several growers named in said contract and named as defendants herein, which said berries were not delivered to plaintiff in accordance with the terms of said contract, so that the damages resulting from such nondelivery may be ascertained and computed as a setoff and counterclaim to the amount due and owing from plaintiff to defendant; that there are approximately one hundred growers whose names are attached to said contract, and that in order to secure any relief whatsoever in actions at law for damages, it would be necessary to institute and prosecute a large number of actions for damages, to wit: approximately one hundred actions, and that a multiplicity of suits may be avoided by an accounting as herein demanded; that plaintiff has duly demanded of the defendant Salem Fruit Union that it account to plaintiff for the number of pounds of berries produced by its several growers, which were not delivered by defendant to plaintiff, and that defendant has refused and now refuses so to account or to furnish plaintiff any information thereon.''

The plaintiff's prayer is in part as follows:

''First: That a temporary restraining order be issued, restraining and enjoining the defendant Salem Fruit Union, its officers and agents, from in any manner whatsoever offering to sell the 1,200 tons of loganberries, commonly known as the Salem Fruit Union Pool, and from in any manner releasing the several growers constituting said so-called pool from their

several contracts to deliver berries to it for the purpose of sale to plaintiff in fulfillment of the contract and agreement attached to plaintiff's complaint, and designated as exhibit 'A.' ''

Second, it is asked that the several defendant growers, naming them, be enjoined from singly or collectively attempting to dissolve said pool or to dispose of the whole or any part of the berries covered by the contracts constituting said pool, to any purchaser or purchasers whatsoever pending the final hearing of this suit. Third, the prayer requests that at the final hearing said temporary injunction be made permanent and that the defendant Salem Fruit Union be enjoined from delivering said 1,200 tons of loganberries to any corporation, person or persons whomsoever other than plaintiff, and that the defendant Salem Fruit Union and the defendant growers be decreed to perform specifically the contracts set forth in exhibits "A" and "C," and to deliver the loganberries which defendants contracted for the year 1919 to plaintiff, also for other and further equitable relief.

The defendant Salem Fruit Union answered, admitting the corporate existence of plaintiff and the Northwest Fruit Products Company and admitting the existence of the contract between itself and the latter corporation (exhibit "A") and also the identity of the contract between said defendant and the other defendants (exhibit "B"). The execution of the contract between defendant Salem Fruit Union and the defendant growers (exhibit "C") was also admitted, as well as the fact that there was an unsettled balance due from plaintiff to defendant on account of berries delivered in 1918. All the other allegations of the complaint were denied.

The answer then sets up the following affirmative defenses:

"That after the making of the contract alleged in said complaint, designated therein as exhibit 'A,' to wit: on or about the first day of January, 1918, and before any alleged breach thereof, it was agreed by and between the plaintiff, assignor of said contract, viz.: Northwest Fruit Products Company, a corporation, and the defendant Salem Fruit Union that the said contract should be waived, abandoned and rescinded; and they then waived, abandoned and rescinded the same accordingly.

"That before the commencement of this suit the defendants herein who signed the contracts of which a form is attached to said amended complaint and marked exhibit 'C'; and who are referred to in said contract as 'Growers,' each and all revoked and withdrew any and all power, authority and agency which the said defendant Salem Fruit Union then or theretofore had under said contracts, designated as exhibit 'C,' to sell or dispose of any of the loganberries to be grown by the defendants who executed said contracts, or any part of such berries, and that since said revocation the defendant Salem Fruit Union has not had and does not now have any power, authority or agency to sell or deliver any of the loganberries grown by said defendants who signed said contracts designated as exhibit 'C.'

"That the plaintiff ought not to be permitted to allege or say that the said contract designated in said amended complaint as exhibit 'A' is now in force or effect, or that any pool of loganberries organized or created by said contracts designated as exhibit 'B' or exhibit 'C' has been continued or is now in existence, or of any validity whatsoever, or that the defendant Salem Fruit Union is obligated to deliver to plaintiff all or any part of the loganberries mentioned in the said contracts, or that the defendant Salem Fruit Union signed said contract so designated as exhibit 'A' after the growers therein mentioned had all executed contracts in form as exhibit 'B,' and

at the time of the execution of said exhibit 'A,' and at all times thereafter, the Northwest Fruit Products Company well knew that the berries to be delivered under said exhibit 'A' did not belong to this defendant, and that the same could be produced by this defendant for delivery only by the enforcement of said growers' contracts so designated as exhibit 'B,' but with such knowledge, the said Northwest Fruit Products Company, on or about the first day of January, 1918, requested and induced the defendant Salem Fruit Union to procure the execution by the defendants whose names are set forth in paragraph 4 of this defendant's answer of the contracts of which a form is attached to said complaint and marked exhibit 'C,' whereby the pool formed by the defendants who executed the contracts designated as exhibit 'B' was dissolved, and this defendant was rendered powerless to make delivery of the berries so pooled as required by said exhibit 'A,' all of which was at all times well known to the plaintiff; and for that the said Northwest Fruit Products Company, with the knowledge and consent of the plaintiff, on or about the twenty-ninth day of March, 1919, for a valuable consideration, executed jointly with this defendant a release, whereby the defendant Roy V. Ohmart was duly released and discharged from any and all obligation to deliver the loganberries then or thereafter grown on his premises to plaintiff or to the said Northwest Fruit Products Company or to the defendant Salem Fruit Union, or otherwise to keep or perform any of the covenants or agreements of the purported pool formed by said contracts designated as exhibit 'B,' or the pool intended to be created or continued by said contracts designated as exhibit 'C,' and the other growers who were so interested in said pools did not consent to or acquiesce in said release or discharge, but on the contrary objected thereto, and thereafter withdrew from said pools, by reason of which said facts the pool alleged in said complaint was dissolved and destroyed; and the defendant Salem Fruit Union now prays the decree of this court

whether the plaintiff ought to be permitted, contrary to its agreements, acts and conduct aforesaid, now to allege or say that the said contract, designated in said amended complaint as exhibit 'A,' is now in force or effect, or that any pool of loganberries organized or created by said contract designated as exhibit 'B' or exhibit 'C' has been continued or is now in existence, or of any validity whatsoever, or that the defendant Salem Fruit Union is obligated to deliver to plaintiff all or any part of the loganberries mentioned in said contracts."

The plaintiff filed a reply, denying the new matter in the answer.

Later, plaintiff, by leave of court, filed a supplemental complaint setting forth the fact that preliminary injunction had been issued in accordance with the prayer of the original complaint and that since that complaint was filed all loganberries contracted to be delivered by the defendant Salem Fruit Union for the season of 1919 matured and the defendant Salem Fruit Union had permitted them to be harvested and marketed so that it had become impossible to secure said berries or any of them under a decree of specific performance, and that notwithstanding said injunction the Salem Fruit Union had failed to deliver to plaintiff the 1,200 tons of berries under said contract or any berries except 34,419 pounds delivered by E. H. Dokken thereunder. The plaintiff further alleged that loganberries of the class contracted to be delivered to plaintiff by the union for the season of 1919 were of the reasonable market value of nine cents per pound; that it was necessary that an accounting be had of the number of pounds of loganberries produced by the several growers named in plaintiff's exhibit "A" and of the berries produced by said growers upon the acreage set out, in order that plaintiff might ascer-

tain the amount of damages accruing to it by virtue of the failure of the union and the growers to deliver the loganberries produced in 1919. There was a prayer for such accounting and for a decree that plaintiff receive from the defendant union the difference between the contract price and the market value of the berries for 1919, also for a decree that it recover from each grower the difference between the contract price and the market value of berries sold by such grower in 1919, and for other and further equitable relief. An answer was filed putting these matters in issue.

Thereafter the defendant union filed what it termed a "supplemental answer," too lengthy to be inserted here, but to the effect that the suit was commenced in the Circuit Court on June 10, 1919, and that theretofore on June 5, 1919, the union had commenced an action at law against the plaintiff to recover the sum of $5,001.71 as a balance due defendant union from this plaintiff on account of fruit and berries furnished to the Phez Company in 1918, in which action the Phez Company filed an answer containing among other matters the following allegations by way of counterclaim:

"That on or about the 24th day of May, 1917, it entered into a written contract with this defendant, Salem Fruit Union, by the terms of which said union agreed to sell and said company agreed to buy annually for the years 1917 to 1921, inclusive, a certain quantity of loganberries, and that a copy of said contract is attached to said answer, marked 'Exhibit A,' and made a part thereof;

"That during the season of 1918 said union failed, neglected, and refused to deliver to said company the 1200 tons of loganberries mentioned in said contract, or any part thereof, save and except 993,001 pounds of loganberries;

103 Or.—34

"That for the season of 1918 the reasonable market price for loganberries in Marion County, Oregon, was five cents per pound, but said company agreed to pay said union a bonus over and above the contract price, of one-half cent per pound for said year, and

"That on account of the failure of said union to deliver said loganberries to said company, in accordance with the terms of said contract, said company has been and is damaged in the sum of $28,139.78."

The identity of the contract and breach of that agreement are set up in the supplemental answer, coupled with an allegation that the said action at law is at issue and pending in the Circuit Court, with a prayer for abatement of the present suit. There is a further allegation in the supplemental answer that no part of the berries of the crop of 1919 was ever delivered to or came into the possession of the union, but that the growers without the advice, assistance, persuasion or encouragement of the union separated and sold their berries to other firms or persons. The new matter in the supplemental answer was put at issue by a supplemental reply.

Previous to the filing of the answer of the defendant Salem Fruit Union a demurrer of the defendant growers to the complaint was sustained, the court holding that as to the growers the complaint did not state facts sufficient to constitute a cause of suit, so that the trial of the case upon the merits was solely between the plaintiff and the Salem Fruit Union. Upon the hearing on the merits the court found that the cause of action arising from the conduct of the fruit union involved the same subject matter as the instant suit. There is no express conclusion of law that by its answer and counterclaim for damages in that case the plaintiff has barred itself from the prosecution of this suit.

The court also found that during the season of 1918 the contract exhibit "A" between the plaintiff and the Salem Fruit Union was mutually rescinded, and it entered a decree dismissing the complaint without prejudice. The plaintiff appeals from the order sustaining the demurrer of the growers and from the decree in favor of defendants.

REVERSED AND REMANDED.

For appellant there was a brief and oral argument by *Mr. John H. McNary, Mr. William H. Trindle* and *Mr. W. C. Winslow.*

For respondents there was a brief and oral argument by *Mr. Oscar Hayter* and *Mr. Roy F. Shields.*

McBRIDE, J.—This appeal involves three propositions: First, the correctness of the order sustaining the demurrer of the growers to plaintiff's complaint; second the correctness of the implied finding that by its answer and counterclaim in the case of *Salem Fruit Union* v. *Phez Company,* plaintiff here was barred from prosecuting the present suit; and third, the correctness of the finding that the contracts, exhibits "A" and "C," were rescinded. These propositions will be considered in the order above named.

1. The ruling upon the demurrer of the growers depends upon the question as to whether there was such privity between the growers and the plaintiff as would entitle plaintiff to sue for breach of the contract as being one made for its benefit. The cases in this state have held generally that where two persons make a contract for the benefit of a third party, such third party may maintain a suit or action directly against the promisor to enforce such contract:

*Baker* v. *Elgin,* 11 Or. 333 (8 Pac. 280); *Strong* v. *Kamm,* 13 Or. 172 (9 Pac. 331); *Parker* v. *Jeffery,* 26 Or. 186 (37 Pac. 712); *Washburn* v. *Interstate Investment Co.,* 26 Or. 436 (36 Pac. 533, 38 Pac. 620); *Feldman* v. *McGuire,* 34 Or. 309 (55 Pac. 872); *Kiernan* v. *Kratz,* 42 Or. 474 (69 Pac. 1027, 70 Pac. 506); *Oregon Mill Co.* v. *Kirkpatrick,* 66 Or. 21 (133 Pac. 69); *Davidson* v. *Madden,* 89 Or. 209 (173 Pac. 320), in which last case all the Oregon precedents are cited. As a rule the Oregon cases arose out of the fact that the promisee owed some debt to the beneficiary which the promisor as part of the consideration agreed to discharge; but in other jurisdictions where such a promise has been held enforceable by the beneficiary no distinction appears to have been made between such a debt and any other legal duty which the promisee owed to the beneficiary, and legally this would seem to be the correct rule. Indeed, in the case of *Washburn* v. *Interstate Investment Co., supra,* the rule is impliedly as stated, with the distinction pointed out in that case that the supposed beneficiary was not named in the contract and that there was no intimation therein that the agreement was for its benefit, which also seems to be a salutary and logical limitation. Thus, if the promisor agrees generally with the promisee that he will discharge all the promisee's obligations, without specifying them or to whom they are owing, no cause of action or suit arises in favor of a creditor of the promisee. But if, on the other hand, he agrees as part of the consideration or substance of the contract that he will discharge a particular debt or legal duty from the promisee to a particular person, he will be liable at the suit of such person, for nonperformance.

The English authorities and many earlier American cases are no doubt in conflict with this view. The great divergence of judicial opinion may be seen by a perusal of Chapter VIII of Williston on Contracts, but it is believed that with few exceptions the later American cases may all be harmonized with the doctrine above laid down. For a learned and interesting discussion of this subject, see *Seaver* v. *Ransom,* 224 N. Y. 233 (120 N. E. 639, 2 A. L. R. 1187), and authorities cited in the exhaustive notes to the principal case in A. L. R.

Assuming, then, that the law will uphold the right of a beneficiary to sue the promisor directly whenever the contract is made for his benefit, provided that the duty or obligation to be discharged by the promisor was one originally owed to the beneficiary by the promisee, we will apply this rule to the facts pleaded by the plaintiff here.

2. By the terms of the contract, exhibit ''A,'' as modified by the agreement of plaintiff to pay an additional one half of one cent bonus, the Salem Fruit Union was bound to deliver to plaintiff and it was its legal duty to deliver to plaintiff the berries grown by the several defendants who executed exhibit ''B'' as modified by exhibit ''C.'' By exhibit ''C'' the growers signing the same bound themselves to deliver to plaintiff, not to the fruit union, all the berries grown on their respective lands, for the price of three and one half cents per pound. By so doing, the duty owed by the fruit union to the plaintiff would be discharged. As between the growers and the fruit union, the latter was merely the agent to make the contract and to see that it was executed, the conduit or hopper through which the berries were to be conveyed to the plaintiff's possession and by which it was assured

of receiving them. Clearly the plaintiff, or, to speak more accurately, the plaintiff's predecessor in interest was the intended beneficiary of exhibit "C." The fruit union was made the agent of the growers for the very purpose of entering into a contract binding them to deliver the fruit grown by them to the plaintiff's predecessor. It had an agency coupled with an interest, to the extent of being permitted to deduct from the sum received for the berries a compensation for its services and expenses in marketing them, and therefore irrevocable, to make the very contract it did make with plaintiff's predecessor. Here, then, are all the elements which go to authorize the growers signing exhibit "C," and the fruit union, to make a valid contract for the benefit of plaintiff: *Seaver* v. *Ransom, supra,* and cases cited in notes in 2 A. L. R., p. 1193. We are of the opinion that the court erred in sustaining the demurrer of Paxton et al. to the complaint, which seems to us sufficient.

3. While it is practically impossible to compel specific performance of a contract of this nature, there is abundant authority that the court may by enjoining the contractor from selling his wares to anyone else, place him in a position where his own interests may be powerful enough to induce him to perform his contract. A leading case on this subject is *Lumley* v. *Wagner,* 1 De Gex, M. & G. 604, sometimes given in other reports as *Lumley* v. *Gye.* In this case a Mrs. Wagner, a noted singer, had engaged herself to sing exclusively at plaintiff's theater, but broke her contract and engaged to sing at the theater of Gye, who was made a defendant with her. The suit was for an injunction forbidding her to sing in the theater of Gye or elsewhere during the season

that she had engaged her services to plaintiff.   In deciding the case the Lord Chancellor said:

"It was objected that the operation of the injunction in the present case was mischievous, excluding the defendant J. Wagner from performing in any other theater while this court had no power to compel her to perform at Her Majesty's Theater.   It is true that I have not the means of compelling her to sing, but she has no cause of complaint if I compel her to abstain from the commission of an act which she has bound herself not to do, and thus possibly cause her to fulfill her engagement."

4. The same doctrine is announced in *Montague* v. *Flockton,* L. R. 16 Eq. 189, and is settled in this state by the case of *Cort* v. *Lassard & Lucifer,* 18 Or. 221 (22 Pac. 1054, 17 Am. St. Rep. 726, 6 L. R. A. 653). The present case is one where the invoking of this power might be peculiarly efficacious.   The growing of loganberries is a new industry; their production is limited to a comparatively small area; they are perishable fruit incapable of shipment in a raw state to distant markets; and had the court below seen its way clear to enjoin the defendant growers from making delivery to any other party than this plaintiff, it seems almost inevitable that the contract would have been observed and the business which the complaint indicates the plaintiff had so assiduously and expensively labored to build up would have been saved from embarrassment and possible destruction. The fact that the remedy was not applied and that defendants by selling their products to other parties have now put it out of their power to comply, ought not to oust equity of the jurisdiction it had when this suit was instituted, but the court should retain the case, and if the allegations of the complaint and the supplemental complaint are found to be true, it should compel the defaulting parties to make good

in damages the losses directly sustained by plaintiff by reason of their default. If plaintiff has a right to recover at all as against the growers, the jurisdiction of equity is obvious, first, because of the necessity of an accounting as between them, the fruit union and plaintiff; second, to avoid a multiplicity of actions or suits between plaintiff and the large number of individual growers; and third, because of alleged collusion between the promisors and promisee fruit union to avoid the contract, which if true amounts to constructive or perhaps actual fraud upon plaintiff. Indeed, respectable authorities are to the effect that the appropriate remedy in this class of cases is in equity rather than law: 1 Williston on Contracts, Sections 358 and 359, where the author observes:

"There is no satisfactory solution of these difficulties in the procedure of a court administering legal remedies only. But one of the functions of equity is to provide a remedy where the common-law procedure is not sufficiently elastic, and no opportunity can be found for the exercise of this function more appropriate than the sort of case under consideration. Much of the difficulty of the situation arises from the fact that three parties are interested in the contract. Common-law procedure contemplates but two sides to a case, and cannot well deal with more. Equity can deal successfully with any number of conflicting interests in one case, since defendants in equity have no community of interest, and under the procedure of the so-called code States, the same thing is possible though separate courts of equity are abolished.

"In the case under consideration the only satisfactory relief is something in the nature of specific performance. The basis for equity jurisdiction is the same as in other cases of specific performance. There is a valid contract, and the remedy at law for its enforcement is inadequate. As the promisee and the beneficiary have both an interest in the perform-

ance of the promise, either should be allowed to bring suit joining the other as codefendant with the promisor. In this way all parties have a chance to be heard. There may always be a possible question as to the respective rights of the promisee and the beneficiary, and also whether the promisor has a valid defense against the promisee and these questions should not be determined in any litigation in which all three interested parties are not joined. Any procedure which not only permits but requires this meets the necessities of the case.''

5. We now come to the second proposition: Is the action of *Salem Fruit Union* v. *Phez Company,* now pending, a bar to this suit? To this we must answer in the negative. It is conceded that the ruling of the learned Circuit Court was predicated upon the theory that, the growers not being proper parties and being out of the case by reason of the fact that their demurrer had been sustained, there remained nothing but a question of damages to be litigated between plaintiff and the union, and that plaintiff had its remedy at law upon the counterclaim pleaded against the union in that action. But, holding as we do that the union was in fact a proper party, the whole foundation upon which that conclusion rested is destroyed. There is a lack of that substantial identity of parties which is required in order that one action may be pleaded in abatement of the other: 2 C. J., § 99 et seq.

6, 7. We next approach defendant's third proposition, which is that both the fruit union and the growers have been released from the performance of the contract, exhibit ''A,'' as modified by exhibit ''C''; that the contract has been expressly rescinded by a verbal agreement between plaintiff and the officers of the fruit union. This is an affirmative

defense and the burden of proof is upon the defendant to establish it by the preponderance or outweighing of testimony. As the testimony is conflicting, it will be of advantage to take a view of the situation at the time defendant claims the contract was rescinded. There is no complaint that the contract between the fruit union and the plaintiff, exhibit "A," and the contract between the union and the growers, exhibit "B," were not satisfactorily carried out in 1917. Both agreements were substantially performed. Late in the year 1917 the increased price of labor and other conditions incident to the war indicated that the crop for 1918 could not be produced profitably at the price of three cents per pound, and the fruit union found itself in the predicament of being absolutely bound by exhibit "A" to furnish to plaintiff 1,200 tons at that price, while its growers could relieve themselves of their obligation to deliver the berries upon which the union depended to fulfill its contract, by the payment of the trifling penalty of ten cents a crate for all berries delivered by them to other parties. While the contract with the growers, exhibit "B," is termed a pool, it was and is in legal effect a separate and individual contract between the union and each separate grower, there being no covenant binding the growers to each other, and the breach of each individual grower could not affect in any way the contract between other growers and the union. There was also the possibility that a grower might sell his land to some other party and, such party not being bound and the land not being bound, there would remain to the union as a remedy only a personal action against the party signing the contract. It was apparent that many growers would take advantage of

the ten cent forfeiture clause in their contracts with the union and sell to other parties, and the union would thereby be rendered unable to comply with its contract with plaintiff's predecessor, and find itself liable to the latter in damages. What plaintiff desired was a sufficient supply of berries to fill its contracts and carry on its business. What the union wanted was some arrangement whereby it could secure the berries to meet its obligation to plaintiff and incidentally get rid of the inadequate penalty clause contained in its original agreement with the growers. The clause in exhibit "C" providing that the covenants in the agreement should "run with the land," was no doubt considered important, although it is doubtful whether it could be enforced in an action at law: *Gibson* v. *Holden*, 115 Ill. 199 (3 N. E. 282, 56 Am. Rep. 146); *Hurxthal* v. *St. Lawrence Boom & Mfg. Co.*, 53 W. Va. 87 (44 S. E. 520, 97 Am. St. Rep. 954). Whether any equitable remedy would arise out of such a covenant need not here be considered. Perhaps another reason which produced in the mind of the officers of the union a desire to have the contract here designated as exhibit "A" changed, was that under its provisions the union was directly liable in damages for nondelivery of the berries, while under the terms of the modification, exhibit "C," the ultimate responsibility for nondelivery was shared by, if not entirely shifted to the shoulders of, the individual growers, unless the union should have openly or tacitly concurred in such failure to deliver. Exhibit "C" was highly advantageous to the union, and in some respects beneficial to plaintiff's assignor. But there is nothing in any of the correspondence prior to the final breach of the contract that indi-

cates that plaintiff's assignor ever intended to rescind a perfectly valid written contract for the delivery of berries at three cents a pound and substitute therefor a verbal agreement for their delivery at three and one half cents.

We do not have to depend upon oral testimony alone to ascertain the fact that a modification of exhibit "A" as to price had been discussed between the officers of the union and the officers of plaintiff's predecessor. Among other things we have this letter:

"Dec. 14, 1917.

"Northwest Fruit Products Company,
    "Salem, Oregon.
        "Attention Mr. Frank T. Schmidt.
"Dear Sirs:

"After talking with you a few days ago in regard to the proposal of your company to increase the price of the loganberry contract we now have with you to 3½ cents net to the grower, the writer took the matter up with the board of directors and they stated that they would be willing to do this, and will take immediate action to resign all of these contracts with the growers on a very much stronger basis than heretofore. We will have a copy of the new contract tomorrow sometime and will bring it down to you to look over, and we wish you would write us a letter confirming the proposal you have made to us so we can have a record for our files.

"With best wishes, we are
                        "Yours truly,
                    "SALEM FRUIT UNION.
                        "By ROBERT C. PAULUS,
                            "General Manager."

From this we naturally infer that two facts had been the subject of discussion between these parties: First, an increase of half a cent per pound in the price of berries; second, a new contract with the

growers, that would make it certain or at least more probable that the growers would deliver at that price. It therefore appears probable that Frank T. Schmidt had offered an advance of half a cent a pound and that the fruit union had in contemplation a modification of its contract with the growers so as to bind them to deliver at the advanced price. The modification was for the mutual benefit of both parties. It also appears probable that plaintiff was desirous that such contract with the growers should be so arranged as to give plaintiff's predecessor a remedy against the growers individually, instead of against the corporation practically composed of these same growers.

Attention is called in plaintiff's reply brief to the fact that verbal agreements and proposals between these parties were almost invariably supplemented by confirmatory correspondence, while in the present instance evidence of what the defendant union claims to have been an actual rescission of contract relations between the parties rests entirely in parol. This is an important circumstance when we consider that defendant's evidence of a rescission rests almost entirely upon the testimony of defendant's manager and is flatly contradicted by the testimony of Frank T. Schmidt, who is said to have been the officer of plaintiff's predecessor who made the rescission. In addition, we search the record in vain for any evidence that at any meeting of the directors with officers of plaintiff's assignor was the subject of rescission of exhibit "A" alluded to or discussed. In fact, the excuse of a rescission of exhibit "A" was never mooted in any correspondence between the parties until the growers (who to a great extent compose the Salem Fruit Union) with the tacit consent of the

Salem Fruit Union made up their minds to violate their contracts and sell their product to other parties at a greatly enhanced price.

The following letter written by the manager of the union is a distinct recognition of the existence of the original contract:

"January 18, 1918.

"Northwest Fruit Products Company,

"Salem, Oregon.

"Dear Sirs:

"We confirm conversation of the writer with your Mr. Frank Schmidt in which he stated that you wish to raise the fresh loganberry contract with you ten dollars per ton. In accordance with the above desire we have had new contracts printed for our growers and will commence signing them up immediately. We also think it will be best for us to make out the contract with you on a basis of 1200 estimated tons, the same as the one made last year, and make a new contract for whatever additional tonnage we can contract at that price.

"Yours truly,

"SALEM FRUIT UNION.

"By ROBERT C. PAULUS,

"General Manager."

Here is no word in relation to the rescission which defendant now claims had been previously made, but rather "you wish to raise the fresh loganberry contract [exhibit "A"] ten dollars per ton." Why "raise" a contract which had been rescinded, annulled and abrogated? This pretext of rescission seems to us to have been an afterthought conjured up to escape the consequences of what war conditions had rendered an unprofitable, if not a losing contract.

Up to May, 1919, there is no written evidence that the defendant fruit union was claiming the complete rescission of the original contract, and then only ap-

parently on the theory that by agreeing to pay and paying more than it was required under the contract as originally drawn, the plaintiff's assignor had abandoned the whole contract. In a letter of May 22, 1919, the secretary of the union says:

"The crop of 1918 as you know, was handled, not under the written contract of May 24th, 1917, but pursuant to an oral agreement with your company, fixing the price of the berries at 3½¢ per pound and more if conditions warranted. This later condition you met during the month of March, by directing us to pay our growers an additional ¼¢ per pound, which we did.

"This oral agreement also provided for a new form of general contract to be executed by our growers, requiring delivery to be made directly to your factory. This agreement was intended to operate in lieu of the old written contract, which had to be abandoned on account of war conditions."

This seems to have been the inception of the idea that by voluntarily advancing the price paid to growers in order to meet changed conditions, plaintiff's assignor had abandoned the original contract entirely. The communication does not say to plaintiff what defendant now claims, to wit: "In January, 1918, you expressly agreed that exhibit 'A' should be rescinded." On the contrary, it reads: "Pursuant to an oral agreement with your company fixing the price of berries at 3½ cents per pound and more, if conditions warranted." A voluntary agreement to advance the price did not have the effect to rescind the contract in other respects, and the testimony shows that the plaintiff kept its agreement in that particular in 1918 and was ready and willing to make further concessions later. We do not feel that defendant has made out a case of rescission. Perhaps it could have compelled the plaintiff to pay the increased price in

succeeding years, although the consideration for such increased price is not apparent. But, as before remarked, that question does not arise here. We conclude that there is not sufficient evidence to justify the finding that the contract was rescinded.

8. Another contention is that the release by plaintiff and the fruit union of one Roy V. Ohmart from his contract to deliver berries dissolved the so-called pool and released all the other parties, including the union. It should be remembered that each grower made a separate contract with the fruit union authorizing it to sell for a fixed price all his berries. The price did not depend on what any other grower was to get, and the release of another grower could not in any way increase or diminish his compensation. The only parties who could be injured by the failure of any grower to observe his contract were the union and the plaintiff. While the arrangement is called a pool and has some of the attributes of that rather hazily defined association, it lacks the element of mutual interdependence between the producers. No grower either gained or lost anything by reason of the fact that the growers' agent and the plaintiff agreed that Ohmart should be released. The objection is highly technical and has no merit. The fact that the defendant union as between it and the growers stood in the relation of principal and agent, coupled with the fact that the plaintiff's assignor and plaintiff knew of this relation, cannot excuse it from liability in this case: 2 Mechem on Agency, § 1714 et seq. The union was to an extent a beneficiary in this transaction, in the respects heretofore mentioned. It furnished greater assurance that its growers would deliver their products, and by exhibit "C" divided the responsibility for failure to deliver. It placed

upon the growers the onus of seeing that its contract that they should "deliver the goods" was faithfully carried out so that it might collect for them the amounts due them for such delivery, and incidentally collect the compensation due it for its services.   Its contract with plaintiff, although in a sense a contract of an agent for known principals, was nevertheless its covenant by which it pledged its own good faith and credit that the fruit mentioned therein should be delivered.   The evidence indicates that it was entirely willing that its growers, who as stockholders practically composed the corporation, should make default. There is of course a technical distinction between the growers *as* growers and as stockholders, but it is in this case a distinction that has no foundation in morals and should not stand in the way of the administration of equity.

Some question is raised as to the validity of the assignment from the Northwest Fruit Products Company and allied companies to plaintiff.   Such defect is not pleaded by way of abatement, and if it were so pleaded, we think the assignment sufficient, especially in equity and where it has been substantially recognized and acted upon by the parties.

9. These considerations naturally lead to a reversal of the decree of the Circuit Court and the order sustaining the demurrer of the growers.   As to future procedure there are practical difficulties.   We might upon the showing here render a decree against the fruit union and send the case back with directions that the issues between the growers and the plaintiff be tried, but such a course would subject the parties to many inconveniences and would leave unsettled the equities between the union and the growers.   There

103 Or.—35

is an account to be stated between each individual grower and the plaintiff, together with an account between these and the union. As for the damages, caused by loss of profits and expenses of advertising, these in view of the disturbed condition of trade are too largely speculative to be capable of appraisal. But taking the allegations of the complaint to be true, the growers who signed exhibit "C" should account to plaintiff for the difference in the price of berries sold to other parties and three and one half cents per pound, the contract price mentioned in exhibit "C." And the fruit union should be held to a like accounting for each of the years in which there has been default. The impracticability of ascertaining the probable profits, if any, which plaintiff may have lost, and of apportioning these among the parties seems to preclude further litigation along that line.

The order will therefore be that this cause be remanded with directions to overrule the demurrer as to all the defendants who signed exhibit "C"; to permit plaintiff, if it be so advised, to file a supplemental complaint as to these defendants; to retry the case as to the growers and plaintiff, and as between the fruit union and plaintiff, so far as either shall desire to do so, leaving the testimony already taken to stand as between the union and the plaintiff; and otherwise to proceed as indicated herein.

REVERSED AND REMANDED.

Denied April 11, 1922.

On Petition · for Rehearing.

(205 Pac. 970.)

Rehearing Denied.

*Mr. Oscar Hayter* and *Mr. Roy F. Shields,* for the petition.

*Mr. John H. McNary, Mr. W. C. Winslow* and *Mr. William H. Trindle, contra.*

PER CURIAM.—The defendants have presented a petition for rehearing, in which they earnestly insist that the conclusions reached by the court in its opinion heretofore filed herein (*ante,* p. 514 (201 Pac. 222), are contrary to the evidence and are beyond the scope of the issues made by the pleadings. A re-examination of the record in the case and a careful reconsideration of the questions presented thereby satisfies us that the result announced in the opinion is correct.

10. The trial court sustained a general demurrer interposed by the defendant growers to plaintiff's complaint. In reviewing that decision, the rule supported by many decisions of this court was discussed and applied, that where two persons make a contract for the benefit of a third party, such third party may maintain a suit or action directly against the promisor to enforce such contract. In the opinion care was taken to recognize the elements essential to a contract that may be enforced by a third party: (1) There must be an intention to benefit the third party. (2) The promisee must owe some obligation to the third party.

In *Vrooman* v. *Turner,* 69 N. Y. 280 (25 Am. Rep. 195), the court said:

"To give a third party who may derive a benefit from the performance of the promise, an action, there must be, first, an intent by the promisee to secure some benefit to the third party, and second, some privity between the two, the promisee and the party to be benefited, and some obligation or duty owing from the former to the latter which would give him a legal or equitable claim to the benefit of the promise, or an equivalent from him personally."

The court continued:

"It is true there need be no privity between the promisor and the party claiming the benefit of the undertaking, neither is it necessary that the latter should be privy to the consideration of the promise, but it does not follow that a mere volunteer can avail himself of it. A legal obligation or duty of the promisee to him, will so connect him with the transaction as to be a substitute for any privity with the promisor, or the consideration of the promise, the obligation of the promisee furnishing an evidence of the intent of the latter to benefit him, and creating a privity by substitution with the promisor. A mere stranger cannot intervene, and claim by action the benefit of a contract between other parties. There must be either a new consideration or some prior right or claim against one of the contracting parties, by which he has a legal interest in the performance of the agreement."

The case of *Vrooman* v. *Turner* was cited or referred to with approval in the following Oregon cases: *Parker* v. *Jeffery,* 26 Or. 186 (37 Pac. 712); *Brower Lumber Co.* v. *Miller,* 28 Or. 565 (43 Pac. 659, 52 Am. St. Rep. 807) (above rule quoted); *The Home* v. *Selling,* 91 Or. 428, 436 (179 Pac. 261) (above rule quoted); *Y. M. C. A.* v. *Croft,* 34 Or. 106, 110 (55 Pac. 439, 75 Am. St. Rep. 568) (above rule

quoted and decision in *Brower Lumber Co.* v. *Miller*
said to be based thereon).

That the rule is accurately stated in the opinion is
not seriously questioned, but defendants contend that
the application of the rule is limited to executed con-
tracts under which some fund or property has come
into the hands of the promisor, in consideration of
which the promisor agrees to pay a debt or discharge
a legal obligation which the promisee owes to a third
party; in support of this contention, defendants cite
the cases of *Washburn* v. *Interstate Investment Co.*,
26 Or. 436 (38 Pac. 620); *Brower Lumber Co.* v.
*Miller*, 28 Or. 565 (43 Pac. 659, 52 Am. St. Rep. 807).
Those cases expressly recognize the rule as stated in
the opinion in this case and as defined in the case of
*Vrooman* v. *Turner.* In applying the rule in the
cases mentioned, the court used the language which
defendants claim limits the rule; in *Brower Lumber
Co.* v. *Miller*, 28 Or. 565 (43 Pac. 659, 52 Am. St. Rep.
807), Mr. Justice Wolverton in the opinion quotes
from the decision in *Parker* v. *Jeffery*, 26 Or. 186 (37
Pac. 712), as follows:

" * * * in nearly if not quite every case coming under
our notice in which the action has been sustained,
* * there has been some property, fund, debt, or
thing in the hands of the promisor upon which the
plaintiff had some equitable claim, and from which the
law, acting upon the relationship of the parties, or
the fund, established the privity, implied the promise,
and created the duty upon which the action was
founded."

And in *Washburn* v. *Interstate Investment Co.*, 26
Or. 436 (38 Pac. 620), Mr. Chief Justice Bean, said:

"But where there is no such fund, debt, or obliga-
tion in the hands of or owing from the promisor, but
only an executory contract by one person to advance

his own money to pay the debts of another, who is a party to neither the contract or consideration, it is difficult to see upon what principle the doctrine can be applied."

In this case there was an obligation owing from the defendant growers to the plaintiff; by exhibit "C" the growers expressly undertook to deliver the berries grown by them direct to the plaintiff and to thereby discharge the obligation of the fruit union to make such deliveries, and the defendant growers controlled loganberries which were the subject of the contract (exhibit "A") between plaintiff and the defendant fruit union, and moreover the plaintiff to all intents and purposes was a party to the consideration of the contract between the growers and the fruit union, so that the rule may properly be invoked to sustain the complaint, even under the limitations placed upon its application in the cases relied upon by defendant. Those cases, however, do not purport to establish limitations upon the application of the rule for all cases.

11. Plaintiff's complaint, however, may be sustained upon other grounds. The contract for the sale of loganberries (exhibit "A") was entered into by the fruit union in behalf of the growers and as their exclusive agent, under the terms of, and the authority given by, the contract (exhibit "B"). The defendant growers were referred to and named in exhibit "A," with the acreage devoted by each to the raising of loganberries and the estimated tonnage raised by each grower. The defendant growers were all members of the fruit union; the latter was organized by the defendant growers to facilitate the sale and delivery of the fruit products raised by them; the contracts under consideration were made pursuant to

that purpose and to effect and carry it out. The sellers in the contract of sale (exhibit "A") were the defendant growers, and the fruit union was their agent, with express authority from them to make the contract, and this was known to plaintiff's assignor at the time the contract was made. The agent and principals mentioned, acting together, shortly before harvest, declared that they would not comply with the contract, and that they intended to sell and deliver elsewhere the berries to which plaintiff was entitled under the contract. Defendant growers were properly made parties to the suit, and the complaint was sufficient as to them, under the doctrine (considered in the original opinion) that the principal is bound by the contracts of the agent made within the scope of his authority, even though the contract is in writing and executed in the name of the agent alone, in cases where the body of the instrument clearly shows that the party executing the contract is acting as agent, and for whom he is acting: 2 C. J. 671, 674; 25 R. C. L. 657; 27 C. J. 298.

12. If the defendants be regarded as strangers to the contract of sale between the fruit union and plaintiff, as contended by defendants, the complaint is still sufficient as to the defendant growers under the rule that where a stranger wrongfully induces another to commit a breach of contract, or intentionally disables such other from discharging the obligations of his contract, the wrongdoer is liable in damages, or in a proper case may be enjoined from carrying out his wrongful purposes: 15 R. C. L. 54, 64; *Angle* v. *Chicago etc. R. Co.*, 151 U. S. 1 (38 L. Ed. 55, 14 Sup. Ct. Rep. 240, see, also, Rose's U. S. Notes); *Doremus* v. *Hennessy,* 176 Ill. 608 (52 N. E. 924, 54 N. E. 524, 68 Am. St. Rep. 203, 43 L. R. A.

797); *Gore* v. *Condon,* 87 Md. 368 (39 Atl. 1042, 67
Am. St. Rep. 352, 40 L. R. A. 382); *Knickerbocker
Ice Co.* v. *Gardiner Dairy Co.,* 107 Md. 556 (69 Atl.
405, 16 L. R. A. (N. S.) 746 and note); *Beekman* v.
*Marsters,* 195 Mass. 205 (80 N. E. 817, 122 Am. St.
Rep. 232, 11 Ann. Cas. 332, and note, 11 L. R. A.
(N. S.) 201); *Wheeler-Stenzel Co.* v. *American Window Glass Co.,* 202 Mass. 471 (89 N. E. 28, L. R. A.
1915F, 1076 and note); *Joyce* v. *Great Northern R.
Co.,* 100 Minn. 225 (110 N. W. 975, 8 L. R. A. (N. S.)
756); *Schonwald* v. *Ragains,* 32 Okl. 223 (122 Pac. 203,
39 L. R. A. (N. S.) 854); *Raymond* v. *Yarrington,*
96 Tex. 443 (72 S. W. 580, 73 S. W. 800, 97 Am. St.
Rep. 914 and note, 62 L. R. A. 962); *Thacker Coal etc.
Co.* v. *Burke,* 59 W. Va. 253 (53 S. E. 161, 8 Ann. Cas.
885 and note, 5 L. R. A. (N. S.) 1091); *South Wales
Miners' Federation* v. *Glamorgan Coal Co.,* [1905]
App. Cas. 239 (2 Ann. Cas. 436, 74 L. J. K. B. 525,
53 W. R. 593, 92 L. T. N. S. 710, 21 Times L. Rep.
441, 1 British Rul. Cas. 1).

13. In discussing the sufficiency of plaintiff's com-
plaint as to the defendant growers, it is said in the
opinion:

"It [fruit union] had an agency coupled with an
interest, to the extent of being permitted to deduct
from the sum received for the berries, a compensation
for its services and expense in marketing them, and
therefore irrevocable, to make the very contract it did
make with plaintiff's predecessor."

Defendants except to the foregoing statement upon
two grounds: First, that in order to constitute a
power coupled with an interest, a property in the
thing which is the subject of the agency or power
must be invested in the person to whom the agency
or power is given so that he may deal with it in his

own name: 2 C. J. 531, 532, and cases cited in notes. Second, the interest which an agent might derive from compensation for his services as agent, even though this compensation is to be paid out of the property to which the agency relates is not a sufficient interest within the meaning of the rule: Williston on Contracts, § 280, pp. 537, 538.

The language to which exception is taken was used to express the situation as it existed before and when the writing (exhibit "C") was executed. Perhaps it would have been more accurate to say that the fruit union had an "agency coupled with an obligation," and that such agency upon that account could not be revoked by the act of the principal.

In Mechem on Agency (2 ed.) Volume 1, Section 569, it is said:

"There may be cases in which the agent has been induced to assume a responsibility, or incur a liability, in reliance upon the continuance of the authority, under such circumstances that, if the authority be withdrawn, the agent will be exposed to personal loss or injury."

Section 579. "The case of the authority, given to secure the agent against some obligation assumed or liability incurred on the principal's account, referred to in the preceding section, has been sometimes termed, for the sake of distinction, a 'power coupled with an obligation,' with the resulting rule that both 'powers coupled with an interest' and 'powers coupled with an obligation' are irrevocable. No objection can be raised to this nomenclature, if it contributes to the determination of the question, though if the distinctions suggested in the preceding sections, as to the nature of the interest which the agent may have in the continuance of the power, are sound, that interest does not depend upon whether the authority is given to enable him to enforce some affirmative right, or to protect him against an obligation assumed.

In either event the authority would be irrevocable by the principal."

In support of the text the author cites in addition to English cases, the following American cases: *Hunt* v. *Rousmanier,* 8 Wheat. (U. S.) 174 (5 L. Ed. 589, see, also, Rose's U. S. Notes); *Hess* v. *Rau,* 95 N. Y. 359; *Chapman* v. *Bates,* 61 N. J. Eq. 658 (47 Atl. 638, 88 Am. St. Rep. 459); *Wiger* v. *Carr,* 131 Wis. 584 (11 Ann. Cas. 998, 11 L. R. A. (N. S.) 650).

The defendant fruit union had entered into a contract binding it to sell and deliver the loganberries raised by the defendant growers during the years 1917 to 1921, inclusive, and had subjected itself to liability for damages for failure to make such deliveries; the defendant growers had authorized the fruit union to make the contract and incur in their behalf the liabilities mentioned.

In Story on Agency (9 ed.), Section 466, we find the situation of the parties in this case aptly discussed as follows:

"But let us suppose that the authority has been in part actually executed by the agent; in that case the question will arise, whether the principal can revoke the authority, either in the whole or as to the part which remains unexecuted. The true principle would seem to be, that if the authority admits of severance, or of being revoked, as to the part which is unexecuted, either as to the agent or as to third persons, then, and in such case, the revocation will be good as to the part unexecuted, but not as to the part already executed. But if the authority be not thus severable, and damage will thereby happen to the agent on account of the execution of the authority *pro tanto,* there the principal will not be allowed to revoke the unexecuted part, or, at least, not without fully indemnifying the agent. As to the rights of the other contracting party in this last case, they are not

affected by the revocation; but he will retain them all, as well as all the remedies consequent upon any violation of them, in the same manner as if no revocation has taken place.''

These authorities fully sustain the result reached in the original opinion as to the sufficiency of the complaint, and at the same time qualify and explain the sense in which it was intended to use the phrase ''power coupled with an interest'' in the original opinion.

The remaining specifications of error set out in defendants' petition for rehearing do not require specific notice.

Petition denied.    REHEARING DENIED.