On motion to dismiss appeal. Motion denied April 13, 1926, argued on the merits March 1, affirmed April 24. Motion to recall mandate denied September 25, 1928.

RUTH W. WALTERS ET AL. *v.* DOCK COMMIS-SION.

(266 Pac. 634; 270 Pac. 778.)

489

For the motion, *Mr. Arthur I. Moulton* and *Mr. William P. Lord.*

*Contra, Mr. W. P. LaRoche, Mr. J. B. Ofner* and *Messrs. Lonergan & Wagner.*

McBRIDE, C. J.—This is a motion to dismiss an appeal for the alleged reason that the transcript was not filed within the time required by law. The transcript, now on file, indicates that an undertaking on appeal was filed June 17th. No objection being made thereto, the appeal was perfected on June 22d. Appellant then had thirty days to file its transcript, which time would have expired on July 22d. The

record further shows that on July 8th an order was made allowing twenty days' additional time within which to file the transcript, which taken in connection with the time already granted would have carried the right to file the transcript to August 11th; that on July 27th an order was made granting thirty days' additional time in which to file the transcript, and that on August 27th, 1925, an order was duly granted allowing a further thirty days' additional time, which, taken with the time not yet expired, would carry the right of appeal to October 10th. The transcript on appeal was filed September 12, 1925, which was within the time allowed and the various extensions. It is averred that the orders of extension are too indefinite to identify the judgment concerning which such extensions were granted, and, while they are not as definite as might be desired, we think they are sufficient.

The motion to dismiss is denied, and the appellant will have twenty days from the date of the denial of this motion within which to file its brief.

MOTION TO DISMISS DENIED.

ON THE MERITS.

This is an action under the Employers' Liability Act brought to recover damages for the death of one Charles Walters. Plaintiff alleges that the act of the defendant caused the death.

The facts are that the defendant maintains in the City of Portland extensive dock and granary facilities. Immediately adjacent to these structures, and standing upon land leased from the defendant, is the plant of the Terminal Milling Company. There is a roadway upon the property of the de-

fendant for the convenience of those desiring access to or egress from its various facilities. Branching off of this main road is a spur road approximately 250 feet in length; its farther terminus is at the flour-mill of the Terminal Milling Company. This spur road is the only means of communication between the plant of the Terminal Milling Company and the main roadway which we have just mentioned. About fifty feet east of this branch road the defendant has a structure referred to in the evidence as a track shed. Two lines of railroad tracks run through it. The building is of sufficient length that it can afford shelter to three cars upon each track while they are being unloaded of their grain. As soon as the contents of a car are removed it is ejected from this structure by a cable which communicates the motive power to the car from an electrical motor in the track shed. Due to the shortness of the cable the ejected car generally comes to rest when it reaches the afore-mentioned branch road. It is possible to move the empty car beyond this point by attaching the cable to other cars and bringing them into contact with the empty cars; thus the empty cars are forced beyond the spur road. Nevertheless the branch road is frequently blocked by empty cars placed there in the manner we have described. A method frequently employed to move these cars from the roadway, so as to afford access to the flour-mill, was to use a pinch-bar and thus impart slight movement to the cars; this motion was retained by the men applying their physical force to the rear of the car.

October 7, 1924, upon the hour involved in this case, this spur road was blocked with one or more

empty cars. At that time a delivery truck sought to approach the mill to deliver a quantity of sacks weighing a ton or more. These sacks apparently had been purchased by the Terminal Milling Company from the manufacturer. Access to the premises was barred by these empty cars. The driver of a truck walked to the flour-mill and found there one Oscar O. Norgard, an employee of the mill company, and informed the latter of the driver's predicament. Norgard called the deceased and told him to get a pinch-bar, so that they could move the cars away and permit the delivery of the bags at the premises of the milling company. The point blocked by the car was approximately 210 feet from the mill. The deceased obtained a pinch-bar in the warehouse of the mill company and together with Norgard, the driver of the truck, and the latter's helper, proceeded to the car and placed it in motion. At about the same time the workmen in the defendant's employ in the truck shed, without making any observations ahead, applied their cable to some cars upon the same track upon which the deceased and the other men were working. When these cars were put into motion one of them caught the deceased between its coupler and the coupler of the empty car to which the deceased was then applying his shoulder, and thereby crushed out his life.

Plaintiffs obtained a judgment based upon the jury's verdict; defendant appeals. The principal error assigned is: the defendant contends that at the moment in question Walters was not acting within the scope of his employment, and was therefore not in an employment within the terms of the Employers' Liability Act. Other assignments of error appurte-

nant to this one and relied upon by the defendant we shall state and dispose of as we proceed.

AFFIRMED.

For appellant there was a brief over the names of *Mr. W. P. LaRoche* and *Messrs. Lonergan & Wagner,* with oral arguments by *Mr. Frank J. Lonergan* and *Mr. J. B. Ofner.*

For respondent there was a brief over the name of *Messrs. Lord & Moulton,* with an oral argument by *Mr. Arthur I. Moulton.*

ROSSMAN, J.—■ When we have once determined correctly whether Walters was acting within the scope of his employment when he addressed himself to the task of shoving the empty car beyond the road crossing, the assignments of error will be substantially solved. It is essential to the plaintiff's case that it must appear that Walters was acting within the scope of his employment, because the terms of the Employers' Liability Act accept into their embrace only employees whose duties require their presence at the scene of the accident at the time of the casualty. The plaintiffs allege that upon the occasion of the fatal moment Walters was in the employ of the mill company, and that he was discharging duties within the scope of his employment. Let us see what the testimony discloses in regard to the nature of Walters' duties. Norgard, as a witness, testified as follows:

"Q. What was the nature of his work? A. He was sweeping, I think, and then feeding in flour."

However, this was not his only duty, for apparently the arrangement was such that one employee had a

right to call upon another for assistance. Thus Norgard testified:

"Q. Had you any supervision over Walters' work? A. No. Only when I was told any time I needed any help or assistance around the mill, to either ask him or Mr. Howe to help me, or some of the other men; whenever we needed help there we were asked to help each other.

"Q. So, for the purpose, you had a right to call on him for any service? A. Yes, sir. * *

"Q. He didn't work under you? A. Well, whenever we needed any assistance at that mill, we have always been told to ask somebody to give us a hand.

"Q. If you needed any help for the work you were doing in the mill, you could ask anyone that wasn't busy? A. They was supposed to help; that's the way it was, all around.

"Q. Sort of a mutual proposition around the mill * * one helped the other? A. That's the orders we got from the foreman all the time * * if we needed any help to ask for it and get it."

The witness testified that his (Norgard's) duties were "cleaning and washing wheat and blending," and "elevating it over into the mill." The foregoing testimony given by Norgard was not contradicted. While in reply to a leading question he testified that his duties were performed inside of the mill, nevertheless other portions of the evidence, which we shall refer to, are sufficient to support a conclusion that removing cars from the crossing was within his duties. The same witness described the events that immediately preceded the accident as follows:

"Q. Will you tell the jury what took place immediately before he was hurt? A. Well, we was over at the mill at the time.

"Q. Over at the Terminal Mill? A. Over at the mill before we went over to shove the cars.

"Q. What were you doing there? A. I came out of the mill, and Walters was standing outside there, and we was standing there talking a few minutes, and a truck driver come past the end of the car coming over there, and I says, 'There's a load of sacks over there, and I guess he is coming over to see if we can help him'; so the truck driver come over and he says: 'We got some sacks for the mill,' and I says, 'Well, we'll go over and help him, Charley,' * * we called him 'Charley,' * * and I says, 'You get a pinch-bar, and we'll go over and help him.' "

As appears in the statement of fact preceding this decision Walters obtained the pinch-bar from the warehouse; he, Norgard, and the two others then placed the car in motion; but at about the same time, a car which the defendant was moving collided with Walters and caused his death. Defendant now contends that when Walters and Norgard undertook to shove their car out of the way they stepped outside of the course of their employment and either undertook a task for the transfer company, which was bringing the sacks to the mill, or were engaged in a frolic of their own.

■ Let us now ascertain from the evidence whether Walters as an employee of the milling company was engaged in performing a duty in its behalf and within the scope of his employment when he placed the empty car in motion. We shall briefly review the evidence, but before doing so, let us remind ourselves of a principle of law applicable to the inquiry. We shall state this principle by using the words found in 4 Labatt's Master & Servant (2 ed.), Section 1566:

"The scope of a servant's duties in relation to the rule illustrated by the cases cited in the last section is defined by what he was employed to perform,

and by what, with the knowledge and approval of his employer, he actually did perform, rather than by the mere verbal designation of his position. The question whether the injured person was acting in the course of his employment is for the jury, where the evidence is conflicting, or where a difference of opinion may reasonably be entertained with regard to the proper inference to be drawn from the testimony. Otherwise that question is decided as one of law by the court.

"Any evidence which has a bearing upon the actual scope of the servant's duties is admissible. One of the most important circumstances to be considered is whether the servant had ever, upon any other occasion, engaged in work similar to that which he was doing when the injury was received. If the conditions under which such work had previously been performed were such as to warrant the inference that the enlargement of his regular functions had been acquiesced in to the extent shown, a court will, in most instances, decline to say, as a matter of law, that the servant was injured outside the proper scope of his employment. The acquiescence upon which the right of action in this point of view depends will of course be inferred only where it appears that the fact of the servant's having discharged the additional duties was known to the master or his agent *ad hanc vicem.*"

In 39 C. J., Master and Servant, Section 402, the rule is stated thus:

" * * But where the servant acts in obedience to an express order of the master, or performs work not strictly within the line of his duty at the command or request of another servant having either express or implied authority to make such command or request, he is within the general scope of his employment. * * "

In Section 403 we find:

"But the scope of a servant's duties is to be defined by what he was employed to perform, and by what, with knowledge and approval of his master, he actually did perform, rather than by the mere verbal designation of his position. Where it is shown that the servants were in the habit of exchanging work or assisting each other in their duties, a servant so engaged is held to be still within the scope of his employment, and an employee may show that conditions under which his work had been previously performed by him were such as to warrant the inference that the enlargement of the scope of his employment had been acquiesced in so as to include the work being done at the time of an injury, or his presence at the place where the injury occurred."

The application of this rule in a few cases by other courts may be helpful. Thus in *Mullin* v. *Northern Mill Co.*, 53 Minn. 29 (55 N. W. 1115), the plaintiff was an employee of the defendant as a blacksmith; he was injured while putting a chain in place on a sprocket wheel. One of the questions was whether his injury occurred while he was acting within the scope of his employment. While passing upon this issue, the court observed:

"We think there is evidence in the case reasonably tending to show that the work was not beyond the scope of his employment, or, in any event, that he was acting at the time under the direction of defendant's authorized agent. At the time of the accident neither the millwright nor foreman was in the mill. The mill was running and lighted for the night, and there were forty workmen. And the evidence tends to prove that in a case like this, when a machine got out of repair, it was the duty of the man in charge to see that it was put in repair. The foreman, who was not present at that time, testified: 'Whenever anything broke of that kind the man that ran the machine or the millwright fixed it. If the

millwright was not there, when I was not there, the machine would lie still until I came, if he could not do it himself, or get some assistance to do it.' Plaintiff had been previously required to assist in repairing the chain, and in this case he responded in good faith to the call of the operative to put it in place.

"Under such circumstances, to prevent a suspension of work in the mill we are unable to see why the practical common-sense rule should not apply which would authorize the operative of the machine to call for assistance upon any one of the employees whose business it was to assist in making repairs."

In *Daley* v. *American Printing Co.,* 150 Mass. 77 (22 N. E. 439), the plaintiff was injured while placing a belt upon a pulley. One of the issues of the case was whether he was required to perform his task. In passing upon this question the court observed:

"There was evidence tending to show that the plaintiff was employed on work which required him to use the elevator; that the elevator was operated by a belt which passed over a pulley situated about twenty feet from the elevator; that the belt was off from the pulley; and that the plaintiff's injury occurred while he was putting it on, in order to enable him to use the elevator in doing his work. It seems to have become a question, at the trial whether it was necessary for the plaintiff himself to attend to putting on the belt, under the circumstances which then existed. The plaintiff had been allowed, subject to an exception by the defendant, to show that there was nobody whose duty it was to put the belt on when it was off; and he afterwards called a witness, by whom he proposed to show further that the belt was frequently off, how it was put on, and who put it on; and 'that there was not anybody specially charged with that; that everybody did it that had to use the elevator,—had to put the belt on.' This evidence was excluded. We think it was competent, as one important element of the plaintiff's case was to show

that he was in the line of his duty in attempting to put on the belt at the time when he was hurt. The fact that the defendant afterwards introduced testimony to show that there was another man whose duty it was to put on the belts, serves to show the importance to the plaintiff of the evidence which was excluded; and indeed this also appears by the defendant's answer, as well as by the argument which has been addressed to us in its behalf. The jury might have believed the plaintiff's witness, if he had been allowed to testify, rather than the defendant's.''

■ In the case before us there was no evidence that the defendant had in its employ anyone whose particular duty it was to move these cars; yet, there was much evidence to the effect that its employees frequently shoved the cars away from the roadway. Thus the witness, Peterson, who was in the defendant's employ up to approximately the time of the accident, testified that the crossing was blocked on many occasions; that the defendant's employees cleared it if they found time to do so; he was then asked:

''Q. What was done, if anything, to get the crossing cleared so the mill company's patrons and employees could use it? A. Well, it was always customary that the employees of the milling company, if they wanted to get in there with a truck or a car, they moved the cars themselves.

''Q. How often a day would that happen,—would they be working on those cars? * * A. Well, whenever a truck came in,—I couldn't say how often,—but whenever a truck came there to get into the flour mill, or either to come into the elevator there, back of the elevator.''

The witness Norgard testified:

''Q. Mr. Norgard, during the time that you were there, how often each day were the employees of the

Terminal Milling Company called upon to work on and about these tracks at this crossing? A. Well, the first time there, it was quite often that we would have to go up * * the first time I worked there for the company, the first year, in 1923, it was quite often that we would have to go there and shove the cars out.

"Q. And this last time? A. This last time? Well, I didn't work there long; it was on that evening shift, so I think there was two times before this that I shunted cars off from that crossing."

The witness Prudham, driver of the truck that brought the load of sacks to the mill, testified:

"Q. About how often would you go down there? A. Oh, sometimes there two or three times a week, and maybe the next week I wouldn't be there that often. * *

"Q. When you came there, how often was it that you found the tracks obstructed with cars at the place where the empty cars came out of the unloading shed of the dock commission. A. Well, it was very seldom I went there it wasn't blocked.

"Q. And when they were blocked, what was the usual method of getting them cleared? * * A. Went over to the flour mill and informed them over there that the tracks were blocked and we had sacks for them.

"Q. And what was then usually done? * * A. They generally brought out that car mover, and we got around them and shoved them out of the road.

"Q. Whose men usually engaged in that operation? A. The flour mill."

The witness used the term "car mover" as designating the pinch-bar which we have previously referred to. We believe that the foregoing constitutes a sufficient basis to support a finding that Walters was acting within the scope of his employment when he undertook to clear the roadway of the empty cars

upon the occasion in question. It is true that the witnesses did not mention Walters' name as one of those who had assisted in moving cars upon prior occasions; nor did they mention some manager of the flour-mill as having authorized the mill's employees to engage in this type of work. But the driver Prudham, as appears from his foregoing testimony, stated that he "went over to the flour-mill and informed them" whenever cars blocked his approach to the mill. It likewise appears that Norgard, who was assisting in moving the car at the time of Walters' death, had previously engaged in similar work. Since the mill company had no employee whose express duty it was to move cars, we believe that the foregoing evidence was sufficient to sustain a finding that Walters was acting within the scope of his employment when he moved the car.

■ ■ The defendant contends that the complaint fails to allege that the defendant was aware of the fact that employees of the mill company frequently moved cars. The complaint alleges: "It was the custom of the employees of said milling company, in cases where cars had been left standing on said tracks, to cause said cars to be removed from said tracks," so that they would not interfere with access to the mill. The charges of alleged duty upon the defendant's part that follow this allegation are clearly predicated upon the theory that the defendant knew of the acts of the employees of the milling company in moving the empty cars. No motion or demurrer was filed to the complaint. Shortly after the trial started the plaintiff offered evidence that it was the practice of the employees of both companies to shove the empty cars out of the way whenever they blocked

the crossing; the question of plaintiff's counsel to the witnesses that brought forth this information designated this practice with the word "custom"; this brought forth from the defendant an objection that the answers sought were "incompetent, irrelevant and immaterial, and not within any of the issues of this case." Later the objection was amplified with the addition of "no allegation that it was a custom as far as the defendant was concerned, or that the defendant knew of the custom of the milling companies' employees." Thereupon plaintiff sought leave to amend his allegation in regard to the custom by adding the words, "all of which defendant well knew." The trial judge observed that the proposed amendment did not change the cause of action; but after his attention had become diverted to the rather remote period of time covered by the proposed proof, he sustained an objection to the amendment as well as the evidence. Nevertheless the court admitted the following evidence, which showed that the defendant's foreman Furgeson was aware of the fact that employees of the mill company sometimes moved the empty cars from the roadway with the knowledge of the defendant. Thus the witness Peterson testified:

"What was done, if anything to get the crossing cleared so the mill company's patrons and employees could use it? A. Well, it was always customary that the employees of the milling company, if they wanted to get in there with a truck or a car, they moved the cars themselves.

"Q. How often a day would that happen,—would they be working on those cars? A. Well, whenever a truck came in,—I couldn't say how often,—but whenever a truck come there to get into the flour mill, or either to come into the elevator there, back of the elevator.

"Q. Do you know whether that was known to, for instance, Mr. Furgeson? A. Why yes, it was.

"Q. Did you ever see him around there when the mill employees were moving cars? A. Yes, sir, several times."

Other evidence with a similar tendency was offered. But in view of the fact that our Constitution forbids us to concern ourselves with the weight of the testimony, we need quote no more for the purpose now before us.

From the foregoing it is evident that there was testimony before the jury which if believed was sufficient to show that the defendant knew of the employment of the milling company's men in moving the cars. In the absence of a motion or demurrer to the complaint, it was clearly sufficient to warrant the admission of this evidence. The complaint alleged the roadway, that on many occasions it was blocked with standing cars, and that it was the custom of the employees of the milling company to move these cars into a position where they would not block the roadway. It is true that the complaint alleges this particular feature of the employment of the milling company's men with the word "custom," but it is apparent that custom was used when employment, practice or duty was meant. We thus find no fault with the complaint, and it follows from the foregoing review of the testimony that there was evidence to the effect that Walters was acting within the scope of his employment when his injury befell him, and that the defendant was aware of the fact that the employees of the milling company, on many occasions, were at and near the intersection of the roadway, engaged in the task of shoving the cars out of the way.

■ ■ These facts, established apparently to the satisfaction of the jury, brought the plaintiff's case within the interpretation of the Employers' Liability Act previously enunciated by this court. In *Saylor* v. *Enterprise Electric Co.*, 106 Or. 421 (212 Pac. 477), our previous interpretation of the act so far as it relates to the effect of the act upon the employees of third parties is summarized thus:

" * * In *Rorvik* v. *North Pacific ·Lumber Co.*, 99 Or. 58 (190 Pac. 331, 195 Pac. 163), we ruled that where an employee of one corporation employer is injured or killed by the failure of another corporation employer, although not an employer of the one injured or killed, to use the precaution required by the Employers' Liability Act, the employee or his beneficiary could maintain an action against the culpable employer under the provisions of the Employers' Liability Act. The opinion ·in *Clayton* v. *Enterprise Electric Co.*, 82 Or. 149 (181 Pac. 411), is authority for the same doctrine; and a statement in *Turnidge* v. *Thompson*, 89 Or. 637, 653 (175 Pac. 281), is an approval of the doctrine."

The above views are reiterated in *Warner* v. *Synnes,* 114 Or. 451 (230 Pac. 362, 235 Pac. 305, 44 A. L. R. 904); they are expressed to like effect by the Circuit Court of Appeals for. this circuit in *Pacific States Lumber Co.* v. *Bargar,* 10 Fed. (2d) 335. Hence the deceased at the time the accident befell him was protected by the high degree of care prescribed by the act, provided the Dock Commission was engaged in a type of work which subjected it to the terms of the act. This issue of fact was properly submitted to the jury. The court, after explaining to the jury those portions of the act which related to the employment of the deceased, presented to them the issue whether

the deceased was required by his employment to move cars, and then told the jury:

"Your next inquiry will be whether the defendant was, as owner, contractor or subcontractor, in charge of, or responsible for work involving risk or danger to the employees or the public, and this is a question for your determination; your conclusion upon the question to be based upon all of the facts and circumstances and evidence in the case."

■ It is argued that the lower court erred when it received evidence that the roadway at the point of its crossing with the railway, was a place of danger. This testimony came from the witness Stillwell who was in charge of operations for the Dock Commission, and was to the effect that he spoke to Mr. Hegardt and informed the latter that the place in question was dangerous, and that Mr. Hegardt agreed that it was in fact dangerous. It was the contention of the plaintiff that the work in which Walters was engaged at the time of his death subjected him to danger, and that the defendant should have taken those precautions for his safety which are enumerated in the Employers' Liability Act. The foregoing evidence was admissible as proof of these contentions. This view of the situation also rendered admissible testimony that while Mr. Stillwell was in charge of the operations around the track shed, a rule was in force among the employees of the defendant, which required someone to see what conditions existed at the crossing before a car was moved out of the shed. This evidence was admissible upon the issue of danger and the practicability of the additional means of safety which the plaintiff contended should have been taken on behalf of Walters.

■ ■ When this action was instituted, Ruth W. Walters, widow of the deceased, was the plaintiff. After the jury had been selected, but before the opening statements were made and before any witnesses had been sworn, the plaintiff offered an amended complaint. The amendment added as a party plaintiff, the infant daughter of the deceased; a guardian had previously been appointed for her. The objection of the defendant was the following: "We enter an objection to the entry of the amendment at this time, may it please the court, and I would like an exception." The original Employers' Liability Act provided:

"If there shall be any loss of life by reason of neglects or failures or violations of the provisions of this act * * the widow of the person so killed, his lineal heirs, * * shall have a right of action. * * " Section 6788, Or. L.

1921 Session Laws, Chapter 26, amended the foregoing so that it now reads:

"If there shall be any loss of life by reason of the neglects or failures or violations of the provisions of this act * * the surviving widow or hubsand and children * * shall have a right of action * * ."

Section 102, Or. L., provides that the court, before trial, may allow any pleading to be amended by adding the name of the party. The amendment should have been proposed before the jury was impaneled. However, we notice that in offering the amendment, counsel for the plaintiff stated: "For some time the matter has been under discussion, and counsel were notified about a month ago that the plaintiff would seek to amend her complaint, and some days ago a copy was left with counsel. That was on the 6th

of April, 2 weeks ago almost." Nothing appears in the record challenging this statement, nor does it appear that the defendant was in any way inconvenienced or prejudiced by the fact that the amendment was offered a little late.

Section 107, Or. L., states: "The court shall in every stage of an action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party." The foregoing, together with Article VII, Section 3c, Oregon Constitution, precludes a reversal of the decision below for this irregularity. We have examined the other assignments of error and find no merit in them.

Finding no reversible error in the record, it follows that the judgment below is affirmed. AFFIRMED.

RAND, C. J., and COSHOW and MCBRIDE, JJ., concur.

---

Motion to recall mandate denied September 25, 1928.

ON MOTION TO RECALL MANDATE.

(270 Pac. 778.)

For appellant, *Mr. Frank J. Lonergan, Mr. J. B. Ofner* and *Mr. W. P. LaRoche.*

For respondent, *Messrs. Lord & Moulton.*

ROSSMAN, J.—The plaintiffs have filed with this court a motion whose purpose is to amend the title of this cause by striking out of the name of the defendant the words "Dock Commission of"; thereupon the name of the defendant will appear as "The

City of Portland, a Municipal Corporation,'' and it will become the judgment debtor. The city earnestly resists this motion. The plaintiffs and the city have filed with us several affidavits setting forth information in regard to the matter thus pending before us. From these affidavits and from the charter of the city we have gathered the following as the pertinent facts. There is no corporate entity entitled the ''Dock Commission of the City of Portland.'' The Dock Commission is a department of the city created for the purpose, among others, of operating the public docks of that city. After this court affirmed the judgment of the Circuit Court, the plaintiffs sought collection of their judgment from the city but it declined payment, because the judgment did not name it as the debtor. The city is protected by a policy of casualty insurance in the sum of $7,500; the insurance company also declined to make payment because the beneficiary named in its policy was not named in the judgment as the debtor. Thereupon, the plaintiffs filed this motion. Several days before the service of the process in this action the attorneys for the plaintiffs, Messrs. Lord & Moulton, represented another client, who had sustained an injury while in the city's employ upon its public wharves. In that action the name of the defendant appeared as ''City of Portland, a municipal corporation, Dock Commission, and W. J. Jones & Son, a corporation.'' Shortly after service of the process in that case Mr. Frank S. Grant, attorney for the city, sent a letter to Messrs. Lord & Moulton, in which he wrote: ''This matter will be handled by W. P. LaRoche, attorney for the commission of Public Docks. Hereafter please recognize him in the case

as this office does not handle the legal work of The Commission of Public Docks." Five days later the complaint and summons in our present action were served. In it, as we have observed before, The Commission of Public Docks of the City of Portland was named as the defendant. While Section 55, Or. L., provides that in actions against a city the summons shall be served upon the clerk of the city, service was made upon the secretary of the Dock Commission. The charter ordinances of the city provide that the city attorney shall have control over all actions in which the city is interested; the city attorney had no knowledge of this action until the plaintiffs sought payment of their judgment; the defense was handled by Mr. W. P. LaRoche, special counsel for the Dock Commission, and by Mr. Frank Lonergan, who represented an insurance company which had written the casualty insurance which we have previously mentioned. Had the process been served upon the auditor of the city, that official would have transmitted the complaint and summons to the city attorney's office, and the latter would have handed them to Mr. LaRoche. Mr. Lord, in an affidavit, avers that when he prepared the complaint in this case he relied upon Mr. Grant's letter, and that he made the Dock Commission defendant, and directed service upon the secretary of that body, so as to clearly indicate the department sued, and avoid the necessity of transmitting the process from the auditor to the city attorney and from the latter to Mr. LaRoche.

The city contends that if we permit the plaintiffs to make the alteration which they request, it would thereby be introduced as the judgment debtor

although it has never had an opportunity to defend itself against the plaintiffs' demands. The motion and its resistance by the city, therefore, requires us to determine whether service upon the secretary of the Dock Commission followed by an appearance of the Commission's attorney in association with the attorney for the insurance company amounted to an appearance by the city. We should carry in mind, however, the contents of Mr. Grant's letter, and the fact that the city attorney's office was entirely ignorant of this action. As is held in *Foshier* v. *Narver*, 24 Or. 441 (34 Pac. 21, 41 Am. St. Rep. 874), it is not the name that is sued, but the person to whom it is applied, and the right party may be served by a wrong name; "service upon a party by a wrong name is a good service and gives the court jurisdiction." But, in order to accomplish the result of giving the court jurisdiction over the individual, either by his right or his wrong name, service must be made upon him, or he must appear and submit himself to the jurisdiction of the court. We believe that neither of these events took place. Section 55, Or. L., directs how service of process should be made. If the plaintiffs rely upon service to yield to the court jurisdiction over the city, it is necessary that they should show that they have complied with the statute; nothing else will suffice: Bowers, Process and Service, § 352. Clearly their service failed to meet the statutory requirements. Since the charter of the city conferred upon the city attorney sole authority over the city's litigation, no one other than the city attorney or some other attorney authorized by him could through an appearance confer jurisdiction upon the court. But the plaintiffs argue that

Mr. Grant's letter constituted an authorization for Mr. LaRoche to appear in this case, and that his subsequent appearance conferred jurisdiction upon the court as effectually as if the city attorney had done so. This contention requires a construction of the letter. It first refers by name to a definite case; it then states that Mr. LaRoche will handle that case. So far, there is nothing in the letter which would authorize Mr. LaRoche to appear in the present case. The above is followed by the statement "this office does not handle the legal work of The Commission of Public Docks." The charter of the city provides: "The City Attorney must attend to, and shall, subject to the direction of the Council have control of all actions, suits or proceedings in which the city is legally interested * * ." Since the plaintiff's action was in fact litigation against the city, the city attorney could not divest himself completely of authority over it and other actions arising out of operations of the public docks and wharves; McQuillin, Municipal Corp. (2 ed.), §§ 394 and 519; *Clough* v. *Hart,* 8 Kan. 487.

The statement by Mr. Grant that if the complaint and summons had been transmitted to him by the auditor he would have handed them to Mr. LaRoche indicated a means whereby the city attorney retained to himself authority over this class of litigation. We are of the opinion that the service of process failed to supply the court with jurisdiction over the city, and that the appearance by Mr. LaRoche and the attorney for the casualty insurance company was not an appearance by the city.

■ The plaintiffs call to our attention the fact that Mr. Hegardt, secretary of the Dock Commission,

verified the answer, and contend that he was an officer of the city of the type mentioned in Section 360, Or. L. Even if we should agree with the plaintiffs in this contention, we do not believe that it would assist them materially in their difficulty, because the charter of the city placed control over the city's litigation in the office of the city attorney and not in the office of the secretary of the Dock Commission. Thus while Mr. Hegardt's verification might be sufficient to constitute the document a pleading, he still lacked authority to determine the city's course in litigation. It is not necessary for us to determine whether those portions of the charter which create the Dock Commission, and yield to it authority, empower it to employ an attorney; because no attorney employed by the commission could usurp the authority granted by the charter exclusively to the city attorney to determine the city's participation in litigation.

The plaintiffs have cited considerable case-law in an endeavor to persuade the court in their favor. We have carefully studied all of the cases cited, because we recognize that the matter before us is a serious and important one. The death of the father and husband which occasioned this litigation has been recognized by this court, as well as the court below, as the negligent act of the employees of the Dock Commission; to lose the fruits of the victory will be a severe misfortune to the plaintiffs. Upon the other hand, to fabricate out of the facts before us case-law, whereby it will be possible to inject into litigation a party as judgment debtor after the action has been tried, appealed and the judgment affirmed, would be fraught with dangerous consequences. From the

cases relied upon by the plaintiffs we have derived but little help. In *Vaccarini* v. *City of New York*, 54 Misc. Rep. 600 (104 N. Y. Supp. 928), the plaintiff sued the City of New York but failed to entitle the city correctly. However, since the "City of New York" appeared by its "counsel to the corporation" and conducted the trial without objection, the court held that it was too late upon appeal to raise this objection. In *Corporation of Georgetown* v. *Beatty*, 1 Cranch C. C. 234 (Fed. Cas. No. 5344), the plaintiff was allowed to amend his writ and declaration so as to correctly entitle the defendant's name. Section 104, Or. L., grants authority to make a similar amendment in this state. In *Folkerts* v. *Powers*, 42 Mich. 283 (3 N. W. 857), the court construed and applied a tax statute. In concluding its decision it observed: "The School District is a necessary party and should have been brought in. But this suit has been pending nearly eight years, and the contest is one where there is no room for doubt in regard to the result on the merits. We know that the presence of the district as a party could have made no difference. The proceeding assailed could not be successfully defended by any party." The court remanded the suit to the court below with directions to add the school district as a party and enter a decree. Nothing in the decision indicates whether the school district resisted this disposition of the matter; but, it will be observed that the court carefully pointed out, that "the presence of the district as a party could have made no difference." In *City of Decatur* v. *Eady*, 75 Ind. App. 688 (105 N. E. 590), the record was uncertain whether Rebecca Eady brought the action as executrix or as administratrix;

she sought leave in the appellate court to amend her assignments of error to show she sued in the latter capacity and not in the former. The court examined the record and found it warranted the conclusion that the action had been brought as administratrix; she also sought leave to amend the name of the defendant as it appeared in the assignments of error so that it would appear "The City of Decatur, Indiana, a Municipal Corporation," in lieu of "The City of Decatur." It was held the amendment was unnecessary; but leave was nevertheless granted. In *Fink* v. *City of Clarendon* (Tex. Civ. App), 282 S. W. 912, the suit was instituted by the city under the name of the "City of Clarendon"; but it was incorporated as the "Town of Clarendon." Since there was no question but what the municipality was the party that had conducted the litigation the court disposed of this irregularity in the title of the cause by remarking: "We suggest that this discrepancy be corrected in future proceedings." In *Eubank* v. *City of Edina*, 88 Mo. 650, we find nothing that bears upon the matter before us; that portion of the decision which deals with the corporate existence of a municipality merely concerns what proof is sufficient to establish its incorporation. Practically the same observations apply to *Commercial Union Assur. Co.* v. *Schumaker*, 71 Ind. App. 525 (119 N. E. 532.) In *Mecca Fire Ins. Co.* v. *First State Bank* (Tex. Civ. App.), 135 S. W. 1083, the plaintiff's original petition named the defendant incorrectly; an amended petition corrected this error. The question then arose whether the filing of the original petition interrupted the running of the period of limitation, or whether that was postponed until the amended petition was filed.

The court very properly attributed that result to the filing of the first petition, because it was not the name but the corporation that was sued. In *Wells Fargo & Co.* v. *Bilkiss* (Tex. Civ. App), 136 S. W. 798, the court held that since "there was no question that appellant was the party sought to be charged" and since "it came in and pleaded to a suit against 'Wells Fargo & Co.,' " the judgment of the court below should be corrected so that it will bear the appellant's true name, "Wells Fargo & Co. Express." In *Auglaise Box Board Co.* v. *Hinton,* 100 Ohio St. 505 (126 N. E. 881), one Bessie Hinton as plaintiff sued a concern entitled the Bloomer Co. on account of a personal injury. At that time the corporate existence of the Bloomer Co. had not been formally dissolved, but it was in fact insolvent and had ceased to exercise its corporate functions. All of its properties were in the possession of the Strawboard Co., a corporation which operated them for its exclusive benefit. The latter company secured casualty insurance in its name to protect itself in the operation of the plant. The plaintiff averred in her complaint that she was uncertain as to the arrangement between the companies and attached interrogatories for answer by the Bloomer Co. The Strawboard Co. defended by its attorney in the name of the Bloomer Company and persuaded the court to sustain a demurrer to the interrogatories. Upon trial the plaintiff secured judgment against the Bloomer Company. In the present suit, wherein a successor of the Strawboard Company is the plaintiff and seeks to foreclose a mortgage executed by the Bloomer Company to the Strawboard Company to secure some of the former's notes, all of which have been indorsed and transferred to the

aforementioned successor to the Strawboard Company, the court dealt with the judgment obtained by Bessie Hinton against the Bloomer Company as though it was a judgment against the Strawboard Company. Its reasons were that the Strawboard Company defended the action; it was in complete control of the plant, and operated it for its exclusive benefit. Under these circumstances the court concluded that the Bloomer Company was but another name for the Strawboard Company, and that it would be warranted in disregarding the corporate entity theory, and in dealing with the party who was really responsible. Thus the court concluded that since the Strawboard Company was the individual which had defended the Hinton claim it had had its day in court. The case of *Marquette Ry. Co.* v. *Ashley,* 221 Mich. 104 (190 N. W. 642), was disposed of by the employment of principles of law analogous to those applied in *Foshier* v. *Narver, supra.* In *Southern Kan. Ry. Co.* v. *Brown,* 44 Kan. 681 (24 Pac. 1100), the court corrected an error of the clerk in designating the defendant in the judgment. There was no question involved in the case as to the identity of the defendant, and the error was patent.

This disposes of all the cases suggested by the plaintiffs. In all of them, with one exception, it was evident that the party from whom payment of the judgment was sought had actually defended the action; no one denied this. The one possible exception was the Ohio case; but, there the court found from the evidence, as presented in the lower court upon a trial, pursuant to proper issues developed in the pleadings, that the party from whose property payment of the judgment was sought was the party who

had actually defended the action although it did so under the name of the Bloomer Company, instead of its true name the Strawboard Co.

The following cases cited by the city are adverse to the contentions of the plaintiffs: *Georgia Motor Sales Co.* v. *Wade,* 37 Ga. App. 24 (138 S. E. 797); *Thompson* v. *American Mortgage Co.,* 122 Ga. 39 (49 S. E. 751); *Chapman* v. *Western Irr. Co.,* 75 Kan. 765 (90 Pac. 284).

■ We conclude that the service of process failed to supply the court with jurisdiction over the city, and that the appearance by Mr. LaRoche and the insurance company's attorney was not the appearance of the City of Portland. The plaintiffs argue, however, that the broad powers conferred by Section 107, Or. L., enables this court to disregard this error. Further pressing this argument they contend that Article VII, Section 3c, Oregon Constitution, authorizes the court to write a judgment against the city. Our disposition of the questions of fact are to the effect that the city was not a party to the case previously; it has not had its day in court, and we do not believe that Section 107, Or. L., and the constitutional provision was intended to enable the court to add a party as judgment debtor after the judgment has been entered.

It follows that the motion of the plaintiffs must be denied.    MOTION TO RECALL MANDATE DENIED.