**UNION OIL CO. OF CALIFORNIA v. HUNT.**

**No. 9277.**

Circuit Court of Appeals, Ninth Circuit.

April 24, 1940.

James Arthur Powers, of Portland, Or., for appellant.

George L. Rauch, of Portland, Or., for appellee.

Before GARRECHT, STEPHENS, and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

James Ralph Hunt, appellee here, plaintiff below, was an employee of Union Service Stations, Inc., a corporation, in a service and gasoline filling station operated by said corporation on the 12th day of June, 1934. In his complaint he avers that on or about that date, in the course of his duties at the said service station, while he was attempting to demount an automobile tire from a wheel or rim, he strained or injured his lower back muscles or bones, or both, allegedly because of defective tools and tire irons furnished by said corporation. Hunt reported the matter to his employer, and he was directed to a doctor for medical treatment. The doctor strapped him with adhesive tape, and he returned to work for three days, but the pain continued and he was put in the care of another physician, who removed the tape, placed about him a corset-type brace and advised him to wear

the same and not to do heavy work. Some days later a new brace was furnished, and Hunt was directed to wear it and was again advised to refrain from heavy work. This brace extended from the hips to the shoulders, and the appellee wore it continuously, removing it only upon retiring; he was not comfortable without it.

On or about July 1, 1934, the appellant, Union Oil Company, absorbed its wholly-owned subsidiary, Union Service Stations, Inc., and took over all its assets and assumed its liabilities. Union Service Stations, Inc., elected not to be bound by the Workmen's Compensation Law for the State of Oregon on July 1, 1932, and said rejection continued in effect through the month of June, 1934, and was not cancelled. The Union Oil Company on July 1, 1934, rejected the Oregon Workmen's Compensation Law, effective as of said date down through the trial of the present case. Prior to and during June, 1934, Union Oil Company was under the Workmen's Compensation Law of Oregon. Union Service Stations, Inc., carried a policy of insurance for its protection and for the payment of compensation to its employees when required by reason of injuries. One policy in question expired July 1, 1934, the date of the absorption of Union Service Stations by Union Oil of California. The Union Oil Company also carried such a policy of insurance, which went into effect the day its subsidiary's policy expired, and, in turn, expired June 30, 1935. The appellee continued to work at the same location, but his connection with the Union Service Stations, Inc., was severed as of June 30, 1934, and he entered the employ of Union Oil Company of California on July 1, 1934.

It appears from the evidence that Hunt was working alone at the service station on the afternoon of November 5, 1934, "a cold, rainy day," when he received a telephone call requesting that someone be sent to a specified location to change a tire on an automobile. Hunt, being alone, did not immediately respond to this call, but waited until another employee at said station came on duty at approximately 2:30 p. m. The automobile needing the tire change was a Plymouth Sedan located in front of an apartment house at First and Williams Streets or Multnomah and First Streets (there is an apparent contradiction in the record) in the city of Portland. This location was some distance from the station at which Hunt was employed, but only a few blocks from another Union Oil station. Shortly after the other employee at his station came on duty, Hunt left him in charge and drove in his own Ford car to the place where the tire was to be changed. There was a four-wheel "Weaver" type jack with a long handle at the station, by the use of which an automobile could be raised for a tire change, etc., without the necessity of the operator thereof getting under the car to manipulate it. The appellee did not take this jack with him because, as he testified, it was too heavy for him to manage and if it had been put in his car, he would be unable to take it out alone. The jack, or one just like it, was introduced as an exhibit and a picture thereof is reproduced in the record. There is evidence in the record that such a jack could be, and was, carried on the running board of a car, with the handle thrown over the fender. When Hunt arrived at the appointed location, he found the car at the curb with its right rear tire flat and the owner of the car in an intoxicated condition; he procured the keys to the car from the owner to unlock the spare tire, took his own jack out of his car, got on his knees and pushed it under the rear axle of the Plymouth. This jack was Ford equipment of the lever rachet type, operated by means of a lever repeatedly engaging a toothed upright member and raising it upward the distance between two teeth to where it is engaged by a pawl. The lever or handle of Hunt's jack was short and it was necessary for him to crawl beneath the overhang of the Plymouth, which projected toward the rear and beyond the back axle. Appellee testified that he would have been unable to use a longer handle or lever with that type of jack because the arc which would be described or measured by the end of the lever farthest from the fulcrum would increase in a certain regular proportion to the length of the lever, and therefore insufficient clearance would prevent the movement of the lever engaging the next tooth of the upright rack necessary to raise the same. A jack which operated on the screw principle whereby a bevel gear is turned by a long rod, upon the end of which is attached a crank handle, the power being transmitted to spirally-grooved, telescoping, upright members by the said bevel gear, would have obviated the necessity of the operator getting under the car. Hunt, while under the Plymouth, raised the right rear wheel thereof

several inches (the record is not clear as to the exact height) by means of his jack; he then began to back out on his hands and knees. As he did so, the jack slipped from under the car, which dropped to the ground, coming to rest on the deflated tire and wheel, at the same time striking Hunt across the lower part of his back. He testified that the blow struck him below the brace he was wearing; that he lost consciousness and when he regained his senses, he was suffering a sharp pain in the region where he had been hit and that he could not use his legs; that he lay under the car for a time and then shoved himself out from under it. He then regained his feet, walked to his car, got into it, and drove to the Union Service Station at Union and Oregon Streets, told the attendant there what had happened. This man, Keith by name, returned to the Plymouth car with Hunt in the latter's car, changed the tire and then drove Hunt to the service station at which Hunt was employed. Mr. Timmer, the manager of the station was present when Hunt returned with Keith, and they advised him of what had happened; Keith got out of the car and Hunt drove home.

It appears from the appellee's testimony that the body of the Plymouth Sedan extended about a "yard" from the axle and that the trunk rack extended "practically a yard out beyond the end of the car," and there was a trunk on this rack. Another witness, Keith, estimated the overhang at four feet. Hunt also testified that his Ford jack was frail and that the part which came in contact with the axle when in use, was flat and smooth, whereas other jacks are equipped or made with prongs to keep the axle from sliding off. When asked why he did not use the jack with which the Plymouth was equipped, he said the jack was broken, that the owner told him "his jack that he had was not any good." It does not appear that he ever saw this jack or even looked for it. He said further that the company did not at that time provide a jack which could be taken out on a service call. There was no testimony given as to why the "Weaver" jack could not be used normally for this purpose, and its weight was undisclosed by the evidence.

When Hunt arrived home his wife called Dr. Dillehunt and told him of the accident or injury. He advised them to come to his office immediately, which they did;

after examination the doctor directed him to go home and to bed for five days and then return to his office. On the appointed day, which was about November 10th, Hunt, accompanied by his wife, returned to the doctor's office, and was again examined by Dr. Dillehunt. The doctor advised that an operation was necessary and that it should be performed soon. After a few days Hunt began to be about again, and he was advised by Mr. Russell, a local company executive, that if he felt like working he could come to Russell's office and do odd, light jobs, such as run errands, get credit card applications and help about the office, but that if he didn't want to work he didn't have to. This continued until February 28, 1935, when Hunt was notified to present himself at the hospital on March 1st for a "lumbrosacral fusion" operation. The appellee arrived at the hospital on the night of February 28, 1935, and was operated upon the following morning. The period of convalescence is testified to by appellee as one of severe pain, mental anguish, and slim hope for the future, but eventually— in six or seven weeks—he walked again and returned to work about July 1, 1935. The operation was successful and Hunt was able to discard the brace, and did not again wear it. Thereafter he continued to be employed at the same service station; subsequently, Hunt and another leased this station from the Union Oil Company, and they continued operating it until about February 1, 1938, at which time the plaintiff entered the employ of the American Tobacco Company. He was still employed by this company at the time of the trial as a sales promoter and salesman; and in connection with his duties he drove a light delivery truck out of Chico, California.

Following the injury in November, 1934, the appellee was carried on the payroll of the Union Oil Company until February 28, 1935, on which date he entered the hospital for the operation. He was then off the payroll until about July 1, 1935, when he returned to duty. During his period of hospitalization and convalescence he received compensation payments from the Hartford Accident Indemnity Company about every two weeks in an amount the same as prescribed by the Workmen's Compensation Act of the State of Oregon. The amount of the compensation payments was fixed the day before the operation

took place after a discussion of the matter between Hunt, Mr. Russell, and a Mr. Hadfield, the representative of the Indemnity Company, on the basis of the salary and commissions earned by Hunt. The Hartford Accident and Indemnity Company paid out for medical and hospital care of the appellee the sum of $585.35 and paid $235.30 directly to him as compensation. There were nine drafts made out in favor of Hunt in payment of his compensation; in the first two the name of Union Oil Company appears as the assured and the policy number 543012, while in all the others the Union Service Stations is listed as the assured and the policy number is given as 519380; in the first draft the date of the accident is stated as November 5, 1934; in the second the date of November 5, 1934, was written in and stricken, and 6/11/34 substituted; in all the others the date of the accident was stated to be June 11, 1934. Each draft bore the words:

"The endorsement of this draft constitutes a clear release and receipt in full settlement of the above claim or account."

"The endorsement of this draft by the payee constitutes a clear release and receipt in full settlement of the claim or account stated on the other side."

The original complaint was filed in the Circuit Court for the State of Oregon, and on petition of the defendant, the cause was removed to the court below. The case was tried in the District Court on the second amended complaint and the amended answer to the second amended complaint. Although the parties submitted the controversy to "pre-trial" procedure prior to the actual hearing of the cause, an analysis of the pleadings is essential to a proper understanding of the issues. The complaint pleads both injuries or accidents but seems to confuse the damage suffered; it fails to satisfactorily state the damages claimed to be attributable to each injury. The complaint alleges "Plaintiff's injuries and the pain and anguish thereof had become greatly increased and said second injury had greatly aggravated and increased the injurious effect upon Plaintiff of the first injury," etc. After denying all the allegations of the complaint save one, except as such allegations were in accord with defendant's affirmative defenses, the answer alleges that "Dr. Dillehunt found that the sprain complained of on June 12, 1934, was a continuing condition," etc. The answer also set up the defenses of assumption of risk and contributory negligence. No reply to these affirmative defenses was filed by the plaintiff, nor does the record show that he requested permission to do so, nor did he attack these defenses by any appropriate motion. Cf. Rule 7, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. The plaintiff suffered the court to instruct the jury on these common-law defenses without objection and stated to the court after the conclusion of the charge that there were no objections. The materiality of the failure or neglect of plaintiff to act in this regard will more particularly appear hereafter.

As a result of the "pre-trial" an "Order Formulating Issues" was signed by the District Judge, which contained certain "admissions," most of which have been included in our statement of the physical facts, and "issues." Among the "issues" were the questions of assumption of risk and contributory negligence. Also set forth as an "issue" was the question, "whether or not said second injury aggravated and increased the injurious effect upon plaintiff of said first injury; and whether or not such second injury, caused the nerves, tissues, bones and muscles of plaintiff's back to become irritated, sore and lime to be deposited about the region of said injury;" etc. It appears from the pleadings and the formulated issues, that the plaintiff's claim was for damages accruing as a result of both injuries. Somewhere in the course of the trial, and for an unrevealed reason, the plaintiff abandoned this theory and "fixed the time of the accident for which he is suing as November 5th, 1934." In the charge the court instructed the jury on this shift of position, "But now what we are dealing with is the alleged accident in November; we are dealing with that solely and alone in determining the liability of the defendant. * * * The accident in June comes into the case merely as explaining how he happened to have the bad back, and what he is claiming is damages for aggravation to the back condition which first became acute back there in June." Verdict and judgment were entered in favor of the plaintiff in the sum of $6,000, and defendant appeals.

The Oregon Employers Liability Act (§ 49-1701 Oregon Code) applies only to employments involving a risk or danger, and which are inherently dangerous, whether due to or caused by machinery or

otherwise, and comprehends hazardous occupations in general, specifically enumerated or otherwise. O'Neill v. Odd Fellows Home, 89 Or. 382, 174 P. 148; Bottig v. Polsky, 101 Or. 530, 201 P. 188; Yovovich v. Falls City Lbr. Co., 76 Or. 585, 149 P. 941. In an action for injuries to a servant within said law, the common-law doctrines of assumption of risk, negligence of fellow servants, and contributory negligence do not apply. Wasiljeff v. Hawley Paper Co., 68 Or. 487, 137 P. 755; Heiser v. Shasta Water Co., 71 Or. 566, 143 P. 917; Jodoin v. Luckenbach S. Co., Inc., 125 Or. 634, 268 P. 51. It must be alleged and proved, however, that the employee, when injured, was acting within the scope of his employment (Brady v. Oregon Lumber Co., 118 Or. 15, 245 P. 732, 45 A.L.R. 812; Walters v. Dock Commission, 126 Or. 487, 245 P. 1117, 266 P. 634, 270 P. 778), and the care required of the employer is commensurate with the degree of danger in the nature of the employment. Camenzind v. Freeland Furniture Co., 89 Or. 158, 174 P. 139; Coomer v. Supple Inv. Co., 128 Or. 224, 274 P. 302. The business and employment in question are, obviously, not within the terms of this law. On motion of the defendant during the trial, the court below so ruled.

 The Oregon Workmen's Compensation Law, Title XLIX, Chap. XVIII, Oregon Code, applies to employers engaged in any of the hazardous occupations therein specified and, as well, to employers and employees who are engaged in an occupation partly hazardous and partly non-hazardous. § 49-1810, Oregon Code. The law may be defined as optional, in that an employer may file with the Commission a written notice of election not to be subject thereto, within certain limitations, and will thereby be relieved of certain obligations and lose the benefits conferred by the law. § 49-1810, supra. Included in the hazardous occupations to which the act is applicable, are "(a) Factories, mills and workshops where power-driven machinery is used; * * *." § 49-1815, Oregon Code. Without in any way committing ourselves on whether the instant occupation is or is not hazardous (our attention has not been drawn to any Oregon case holding the occupation of service station attendant to be hazardous) it may be assumed, arguendo, that the operation of an air compressor by an electric motor, and the pres-

ence of an hydraulic lift at the service station brings the occupation within the scope of § 49-1815 (a), quoted above, under the theory of being partly hazardous and partly non-hazardous. Be that as it may, the Union Oil Company had filed, as we have previously outlined, a waiver of, or election not to be bound by, the terms of this Act. Such waiver or election relieves the employer of the obligation of contributing to the state industrial accident fund, but withdraws the privilege of interposing, in an action by an employee for damages for injury, the common-law defenses of negligence of fellow servant, contributory negligence (other than wilful act), and knowledge of danger and assumption of risk. § 49-1819, Oregon Code. As heretofore noted, the defenses of contributory negligence and assumption of risk were pleaded in the answer and the court instructed the jury on the availability thereof to the defendant, all with the acquiescence of the plaintiff, to the apparent disregard of Section 49-1819. If that section means what it says and if it is applicable to the appellant's service station business, those defenses were not available to the Union Oil Company. Brady v. Oregon Lumber Co., 117 Or. 188, 192, 193, 243 P. 96, 45 A.L.R. 812; Hovedsgaard v. Grand Rapids Store Equipment Corp., 138 Or. 39, 5 P.2d 86. The appellee raised this point in a "Supplemental List of Authorities" filed after the oral argument of the case. As events proved, the appellee was not prejudiced by these instructions because the verdict was in his favor. Section 49-1819 of the Oregon Code precludes our reversing on either of these grounds, though we might be convinced under the evidence that there was contributory negligence or assumption of risk, or both.

Union Service Stations, appellee's employer prior to July 1, 1934, had rejected the Oregon Workmen's Compensation Act; prior to that date the Union Oil Company operated under that law, but on said day, the Union Oil Company ceased to be bound thereby, it having given notice of its intention to the Industrial Accident Commission. While Union Service Stations was not bound by said act, it carried a "Standard Workmen's Compensation and Employer's Liability" policy of insurance with Hartford Accident and Indemnity Company, for the benefit of its employees and of itself. This policy recited that the em-

ployer was not subject to the Workmen's Compensation Law of Oregon, and engaged the insurer, among other things:

"To pay promptly and voluntarily to any person who would have been entitled thereto if this employer was subject to such law, and in full compliance with the provisions of such law in the manner therein provided, the entire amount of any sum payable and all installments thereof as they become payable.

"(1) To such person the compensation provided by such law for any such injury;

"(2) For the benefit of such person the proper cost of whatever medical, surgical, nurse or hospital service, medical or surgical apparatus or appliances and medicines, or, in the event of fatal injury, whatever funeral expenses are included in the provisions of such Workman's Compensation Law."

It further agreed to indemnify the employer against loss by reason of liability imposed upon it by law for damages arising out of injuries to employees, etc. A like policy with the same company, containing similar provisions, was carried by the Union Oil Company from June 30, 1934, to and including June 30, 1935. The former policy was numbered 519380 and the latter 543014. It would appear that if liability exists, the Union Oil Company is liable, and this is because it absorbed its subsidiary and assumed its assets and liabilities. Any payments, whether on its own policy or that of its predecessor, were made for the Union Oil Company.

As we view it, the policies of insurance, Exhibits 26 and 27, are in no way binding upon an employee though they are to a great extent made for his benefit and so provide. One of the principal objects of such policies is to protect the employer, but they were also made for the benefit of third persons—employees—and where a contract is made especially for the benefit of a third person he may enforce it in an action directly against the promisor. Phez Co. v. Salem Fruit Union, 103 Or. 514, 531, 201 P. 222, 205 P. 970, 25 A.L.R. 1090; 12 Am.Jur. § 277, p. 825. This action, however, was filed against the employer, and the Indemnity Company was not joined. The appellee made no further claim against the Union Oil Company for compensation after he returned to work in July, 1935. We assume that had he done so, adjustment of his claim would have been made by the insurer, if it were shown that he was entitled thereto. He was not, as we have pointed out, limited to making such claim for compensation, but, by virtue of the rejection of the Oregon Workmen's Compensation Act by his employer, he had the right to sue for damages at law.

It was necessary for the plaintiff, in order to prevail in his action at law, to plead and prove negligence on the part of his employer; these necessary allegations were made.

The appellant argues that "Compensation payments as measured and prescribed by the state act constitute satisfaction and to allow further recovery for same injury violates rule against double compensation." Counsel for the appellee counters this contention with the argument that all payments made by the Indemnity Company for the appellant, with the exception of one check in the sum of $33.60, including hospital and medical expenses, were on account of the injury received on June 11, 1934. He further asserts that the $33.60 check was charged against the November 5th accident through error. He says: "All of the payments except one were made under the policy to Union Service Stations, Inc., [No.] U.S. 519380 for an entirely different accident than the one sued upon. The one payment made on account of the accident sued upon on November 5, was so made by mistake of the insurance company. * * *" We are justified in assuming under such a statement that the evidence of the hospitalization, the operation, the pain and suffering, the period of convalescence, the medical care and attention must all be attributed to the accident of June 11, 1934. All payments except one check to Dr. Simmons for $7.50, dated July 20, 1934, were made subsequent to November 5, 1934. The medical treatment, the period in the hospital, the operation, and the compensation payments all came after the accident of November 5, 1934; the appellee insists that none of these may be charged against the last accident or injury. He introduced all of the evidence of the accident of June 11th and dwelt at length on the mental tortures following his operation and then permitted the trial judge to say to the jury, without objection, "The accident in June comes into the case merely as explaining how he happened to have a bad back," etc.

Charging the jury on the subject of damages, the trial court told them: "Now,

should you feel that the plaintiff is entitled to recover, he would be entitled to reasonable compensation for his pain and suffering and, in general, such amount as would compensate him for his injury, *what has gone before in the way of pain and suffering* and for any permanent consequences, should you find that his injury if of a permanent nature, * * *." (Italics supplied.)

Thereafter, before the jury retired, counsel for defendant complained to the court that "there could be no recovery for any condition that he [plaintiff] had prior to November 5th, * * *." The court then cautioned the jury that "the damages, if any, allowed to the plaintiff can only be for damages that occurred from that second accident by way of aggravation of his then existing condition, such as you might find it to be."

■ The italicized portion of the charge set forth appears to be clearly error for the reason that it does not confine the pain and suffering to the injury in issue—that of November 5th—but the cautionary words, given by the judge after objection made by counsel for defendant, might, perhaps, be held curative.

■ In order to recover damages for aggravation of a previous injury or a condition with which the plaintiff is suffering at the time he received the injury which is the basis of a suit, the plaintiff must first plead aggravation. Maynard v. Oregon R. Co., 46 Or. 15, 22, 78 P. 983, 68 L.R.A. 477; Guild v. Portland Ry. L. & P. Co., 64 Or. 570, 575, 131 P. 310; Dorn v. Clarke-Woodward Drug Co., 65 Or. 516, 519, 133 P. 351; Boatright v. Portland Ry., L. & P. Co., 68 Or. 26, 34, 135 P. 771; Salmi v. Columbia & N. R. R. Co., 75 Or. 200, 208, 146 P. 819, L.R.A.1915D, 834. If the facts of aggravation of injury are proved, "The wrong-doer must answer for any aggravation of the plaintiff's condition for which he is responsible, and that is the limit of his liability." Sutherland on Damages, vol. 4, § 1244, p. 4676. The recovery, however, must not include damages for injuries which result from the original injury, but must be confined to damages for aggravation of that condition or injury. Jones v. Caldwell, 20 Idaho 5, 116 P. 110, 48 L.R.A.,N.S., 119, 121. It follows, then, that the plaintiff cannot recover in this action for' any injuries received prior to November 5, 1934. Maynard v. Oregon Railroad Co., 46 Or. 15, 22, 78 P. 983, 68

L.R.A. 477. The difficulty with the situation presented here lies in the fact that much of the evidence of pain and suffering and other damages applied only to the first injury, for which any right to recover was altogether abandoned during the trial —at just what stage of the proceeding is not apparent. So we have the anomaly of an award of damages for a second injury based upon improperly admitted evidence concerning a prior injury. Evidence of the first injury and damage thereunder is irrelevant for any purpose, other than to show aggravation. The prejudicial nature of evidence of pain and suffering connected with an injury not in issue and no part of which is specifically, precisely, or definitely made to relate exclusively to the vital fact here in issue cannot be denied. Such evidence had no place in the record and it was prejudicial error to permit the plaintiff to introduce it, because he confines himself in this suit to a demand for damages for the claimed injury of November 5, 1934. If the facts and circumstances above mentioned relating to the first injury are withdrawn from consideration, a failure to prove damages to justify a verdict under the injury of November 5, 1934, possibly might result, for the appellee unquestionably was benefited by the operation, at least to the extent of being able to discard the brace which he found necessary to wear prior to that injury. Suing for one injury, the plaintiff was not entitled to collect for damages suffered as a result of another injury, and the admission of any evidence of pain and suffering relating to the latter must be considered error. This does not preclude, however, the reception in evidence of testimony of the plaintiff's condition immediately preceding the second injury, which would be admissible for the purpose of showing a base or standard for measuring the damages suffered by the plaintiff in the said second injury.

■ It is said in the article on "Damages," in American Jurisprudence:

"The damages recoverable in any case must be susceptible of ascertainment with a reasonable degree of certainty, or, as the rule is sometimes stated, must be certain both in their nature and in respect of the cause from which they proceed." 15 Am.Jur. § 20, p. 410.

"The damages recovered in any case must be shown with reasonable certainty both as to their nature and in respect of

the cause from which they proceed. No recovery can be had where it is uncertain whether the plaintiff suffered any damages unless it is established with reasonable certainty that the damages sought resulted from the act complained of. Hence, no recovery can be had where resort must be had to speculation or conjecture for the purpose of determining whether the damages resulted from the act of which complaint is made or from some other cause, * * *." 15 Am.Jur. § 22, p. 413.

For Oregon authority that the quantum of damages cannot be based upon or left to speculation, surmise, or guesswork, see Albright v. Keats Auto Co., 85 Or. 134, 166 P. 758. See also 17 C.J. § 90, p. 758.

In this view of the case it is unnecessary to discuss any further questions raised by the briefs.

Judgment reversed and cause remanded.