1'2



# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable Geo. H. Sheppard
Comptroller of Public Accounts
Austin, Texas

Dear Sir:

Opinion No. O-5404
Re: Liability for ad valorem
taxes of peanuts held and
stored by a cooperative
marketing organization in-
corporated under Articles
5737, et seq., V. A. C. S.

Your letter of June 15, 1943, reads as follows:

"The Southwestern Peanut Growers Associa-
tion, with headquarters at Gorman, Texas, had
about 1500 tons of peanuts in storage at Tolar,
Hood County, Texas, on January 1, 1943. This
organization is a cooperative association in
which the finances for the purchase of peanuts
from the farmers are to be supplied by the
government. And from the information submitted
to this department this association is a non-
profit organization whose sole purpose is to
serve the farmers and producers of peanuts in
order that they may receive better prices for
their production. This Association has some
500 or more warehouses scattered through the
peanut producing areas of the state.

"Are these peanuts in storage on January
1 subject to state, county, and political sub-
division ad valorem taxes for the year 1943?"

From correspondence with local officials and other
interested parties and from our investigations, we have as-
certained the following facts in connection with your request,

and we expressly predicate this opinion upon the assumption that these facts are correct:

(a) The Southwestern Peanut Growers' Association is a non-profit, non-stock corporation chartered under and existing by virtue of Articles 5737, et seq., V. A. C. S., and having as its primary purpose the marketing of peanuts produced by its members.

(b) Members who desire to market their products take their peanuts to a warehouse which the Association has denominated an "Official Receiving Agent." At the warehouse the peanuts are weighed and graded and a warehouse receipt is issued therefor.

(c) Under an agreement with the Federal Surplus Marketing Administration the Association pledges these warehouse receipts, and, from the money so obtained, pays those members who have delivered peanuts a fixed price established by the Marketing Administration.

(d) The Association sells the peanuts on the best possible terms, and, if the receipts from such sales exceed the amount for which the warehouse receipts are pledged, the excess, minus necessary operating expenses, is periodically refunded to the members in proportion to the amount of peanuts which they have delivered to the Association. Under present circumstances the Association sells only to agencies of the federal government and only at prices fixed by the government, but under normal circumstances sales can be and have been made to private vendees.

(e) At the time that the member delivers peanuts to the Association's warehouse, he signs the following statement:

Honorable Geo. H. Sheppard, Page 3

"I hereby certify to the Southwestern Peanut Growers Association and the Secretary of Agriculture of the United States that I produced in 19__ the peanuts described in the Warehouse Receipt attached hereto, numbered the same as this Certificate, and in the Statement of Settlement shown below, and I deliver and hereby sell said peanuts to the Association and request that they be accepted under the terms of the Peanut marketing program, fiscal year of 19__ promulgated by the Surplus Marketing Administration and warrant that I am qualified as the producer of these peanuts to réceive the benefits of said Program. I certify and warrant that said peanuts are free from liens, titles and encumbrances except as listed herein and direct that payment for said peanuts be made to
_____(Payee)

"I hereby apply to said Association for membership or renewal thereof, and agree to comply with the provisions of its charter, by-laws, regulations and any amendments thereto, and agree to deliver peanuts produced by me as may be to my advantage."

In Texas Farm Bureau Cotton Association v. Stovall, 253 S. W. 1101, in considering an arrangement akin to that here involved, Chief Justice Cureton pointed out that the Association acquires title to the produce which it obtains from its members and said at p. 1107:

"The cotton is to be delivered to the Association without any provision for its return; the Association is authorized to have the cotton handled, processed and stored; it is authorized to borrow money on, pool, and sell the cotton; in other words, the Association is authorized to exercise all acts of ownership over the cotton after its delivery, subject only to the method prescribed for determining its price."

However, despite the fact that the member-producer surrenders all of the foregoing incidents of ownership to the

Honorable Geo. H. Sheppard, Page 4

Association at the time of the delivery of his produce and despite the fact that the agreement with the Association is couched in terms of "sale and delivery," the Supreme Court has held that contracts of this kind do not involve an "absolute sale," and has said that the Association acts merely as a selling agent for its members. Thus in Texas Certified Cottonseed Breeders' Association v. Aldridge, 61 S. W. (2d) 79, the Court said at pp. 82-83:

> "The construction of this contract may be based upon one cardinal rule, viz., What was the intention of the parties thereto when construed in connection with the history of the class of legislation and the purposes sought to be attained? What is the nature of the title by which an association holds property which it is marketing for its members? To what extent does it act in its own corporate right and to what extent in a fiduciary capacity? The intention of the parties to a contract will control. If necessary, to give effect to the intention of the parties courts will brush aside mere form and examine the instrument as a whole, in the light of the nature and circumstances of the transaction, with a view of ascertaining the true intention of the parties expressed in the instrument. Co-operative marketing associations and their operations have brought their share of new problems. They have taken their place in the business world, and dealers, manufacturers, and business men in general are buying their commodities. The law and the contracts executed thereunder authorize the association to market and sell the agricultural products of its members. The association is made the agent of its members to handle their products; it is given the authority to borrow money on the products and to pledge same as security for any of its obligations. It also has the right to distribute the money so borrowed as advances equitably among the breeders in proportion to their delivery to the association,

Honorable Geo. H. Sheppard, Page 5

or may use any part thereof in its business operations. The title of the commodities is placed in the association to carry out these purposes. The authority conferred upon the association is necessary for it to operate and function successfully. It has no assets except the commodities delivered to it by the members of the association. It is a non-stock and nonprofit concern, and it must depend solely for its existence upon the contracts made with its members. To accomplish this end, the Legislature has announced that it must handle only the products of its members, and will not countenance a divided service by permitting it to handle the products of nonmembers.

"The aid of the great financial institutions of the country is essential to the success of these associations. The association must have financial assistance before it can function, and the agent must have power to pool and sell the commodities it offers for sale or pledge same as security. For these purposes there is no limitation as to the authority conferred upon the association. The farmers as a group form the association, and appoint it to act as their selling agent. They turn over to the association their commodities to be pooled and sold on the market to the best advantages. However, the officers of the association have the controlling decision as to when and how the sale shall be made. This permits the association to place the commodities in its hands for sale when the conditions are favorable, and prevents a dumping on the market of commodities for which there is no demand.

"By the terms of the contract the grower has surrendered control over the sale of his product, and thereby to this extent has

Honorable Geo. H. Sheppard, Page 6

divested himself of an important element of ownership. The contract upon this point is clothed in the terminology of a sale. The relation of consignor and factor has been abandoned. The logical and practical object of the members, as expressed in the contract, is to clothe the transaction in the language of a sale for the purpose of permitting the exercise of all powers named in the contract rather than a consignment in order to enable the association to enter bona fide transactions free from the embarrassment arising out of an incomplete title. The agreement provides that the breeder agrees to sell and the association to buy certain designated cottonseed to be grown or acquired by the breeder during a certain time; that the association will use its best efforts to resell the products on such terms and conditions and by such ways and at such times as its officers may deem advisable, and will pay over to the breeder the net amount received as the purchase price of the commodities, less freight, insurance, and interest, and, after deducting the cost of maintaining and operating the association, the costs incident to the handling, storing, and marketing thereof, including a reduction of not to exceed 10 per cent. of its gross resale price for reserves which may be used by this association for any purpose. However, such reserves shall remain the property of the breeder, and shall be refunded at book value at such time as the association shall determine. Delivery of the cottonseed completes the sale.

"The members of the association, in order to promote their welfare, delivered their seed to the association. They constituted the association their agent with broad and exclusive powers to handle and sell their commodity. This was necessary to accomplish the very purposes for which it was created. It being too clear

Honorable Geo. H. Sheppard, Page 7

> intention of the members to create a true co-
> operative marketing association, under the
> powers enumerated by law and by the contracts,
> to perform certain services exclusively for
> its members, and to hold in the face of this
> intention that the delivery of the seed to the
> association was an absolute sale would destroy
> it as a co-operative marketing association.
> The members have conferred on this association,
> as their selling agent, such title to the cotton-
> seed with plenary powers to handle and dispose
> of same, but the association handles the pro-
> ceeds thereof for the benefit of itself and its
> members. See Johnson v. Staple Cotton Co-op.
> Ass'n, 142 Miss. 312, 107 So. 2; Tobacco Grow-
> ers' Co-op. Ass'n v. Jones, 185 N. C. 265, 117
> S. E. 174, 33 A. L. R. 231; Haarparinne v.
> Butter Hill Fruit Growers' Ass'n, 122 Me. 138,
> 119 A. 116; Phez Co. v. Salem Fruit Union, 103
> Or. 514, 201 P. 222, 205 P. 970, 25 A. L. R.
> 1090; Columbia Law Review for February, 1923,
> p. 91." (Emphasis added)

Section 19 of Article VIII of our Constitution pro-
vides:

> "Farm products in the hands of the pro-
> ducer, and family supplies for home and farm
> use, are exempt from all taxation until other-
> wise directed by a two-thirds vote of all the
> members elected to both houses of the Legisla-
> ture."

The Legislature has never by a two-thirds vote of all members
of both houses imposed a tax on farm products in the hands of
the producer.

In view of the construction given by our courts to
arrangements of the type under consideration, we feel that the
peanuts involved in the instant question are still "farm pro-
ducts in the hands of the producer" within the meaning of the
above-quoted provision and as such may not be taxed. The ob-
vious purpose of Section 19 was to prevent the imposition of

Honorable Geo. H. Sheppard, Page 8

a tax on farm products when such tax would bear directly upon the producer of such products. This purpose cannot be accomplished if taxes are levied upon goods held as are the peanuts in the instant situation, for the burden of such taxes would fall directly upon the producers of such goods. Consequently, notwithstanding the fact that legal title to the peanuts is vested in the corporation rather than in the producers, you are respectfully advised that the peanuts are not subject to taxation and your question is answered in the negative.

Trusting that the foregoing satisfactorily answers your inquiry, we remain

Yours very truly

ATTORNEY GENERAL OF TEXAS

APPROVED JUL 16, 1943

Gerald C. Mann

ATTORNEY GENERAL OF TEXAS

By R. Dean Moorhead

R. Dean Moorhead
Assistant

RDM:ff



APPROVED
OPINION
COMMITTEE
BY